UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ED BRAYTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OFFICE OF THE UNITED STATES | ) |
| TRADE  REPRESENTATIVE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Civil Action No.: 08-0855 (RMU)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, the Office of the U.S. Trade Representative ("USTR"), respectfully moves for summary judgment in this case brought under the Freedom of Information Act ("FOIA"). Plaintiff, Ed Brayton, seeks a single document consisting of an agreement between the United States and the European Union "regarding America's online gambling laws."  Complaint ¶ 5. USTR located the document and withheld it, pursuant to Exemption 1, on the basis that the document is classified "foreign government information," as defined in Executive Order 13292. There are no material disputes of fact and USTR is entitled to summary judgment.

A Memorandum of Points and Authorities, including a Statement of Material Facts, and proposed order are attached.

July 9, 2008                                        Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

_/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

_/s/_ _____
ALAN BURCH, D.C. Bar # 470655
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-7204
alan.burch@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                        )
ED BRAYTON,                             )
                                        )
          Plaintiff,                    )          Civil Action No.: 08-0855 (RMU)
                                        )
    v.                                  )
                                        )
OFFICE OF THE UNITED STATES             )
TRADE  REPRESENTATIVE,                  )
                                        )
          Defendant.                    )
_____ )
```

**DEFENDANT'S (1) MEMORANDUM OF POINTS AND AUTHORITIES
AND (2) STATEMENT OF MATERIAL FACTS
<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Defendant, the Office of the U.S. Trade Representative ("USTR"), respectfully moves for

summary judgment in this case brought under the Freedom of Information Act ("FOIA").

Plaintiff seeks a copy of an agreement concluded under World Trade Organization ("WTO")

procedures between the United States and the European Union "regarding America's online

gambling laws."  Complaint ¶ 5.  USTR withheld the document, pursuant to Exemption 1 of

FOIA, on the basis that the document is classified pursuant to an Executive Order.  The Order

provides for classification of information that is subject to an arrangement between the United

States and another government or groups of governments to keep the information confidential.

Here, the United States is required under applicable WTO procedures not to disclose this

document to the public.  <u>See generally</u> Decl. Julia Christine Bliss, attached hereto as Exhibit 1.

The document is the product of an effort by the United States to clarify its commitments

under the WTO General Agreement on Trade in Services ("GATS") on trade in gambling

services.  In compliance with procedures adopted by the WTO Council on Trade in Services, which oversees the GATS, the United States executed a "Joint Letter" and report (hereinafter, the "Agreement") last December describing certain compensatory adjustments that the United States committed to make in its GATS commitments in return for clarifying its commitments on trade in gambling services.  See Bliss Decl. ¶ 5.  Article XXI:2(a) of the GATS requires a WTO member seeking to modify its GATS commitments, such as the United States in this instance, to negotiate separately with each other WTO member "that may be affected by the proposed modification, with a view to providing . . . offsetting trade concessions" to that member.  Id. Under GATS Council procedures, the WTO Secretariat is to convey such agreements to other members "in a secret document."  Id. ¶ 6.

On December 19, 2007, Brayton submitted a FOIA request via electronic mail to USTR requesting "the full text of the settlement between USTR and the European Union regarding America's online gambling laws."  Complaint ¶ 5.

USTR withheld the Agreement, pursuant to Exemption 1, based on Executive Order 13292,[1] which provides for classification of "information produced by the United States Government pursuant to or as a result of a joint arrangement with a foreign government or governments, or an international organization of government, or any element thereof, requiring that the information, the arrangement, or both are to be held in confidence."  See Bliss Decl. ¶ 7 (quoting E.O. 13292, Section 6.1(r)).

---

[1] The Bliss Declaration refers to the Order as "Executive Order 19258, as amended," Decl. ¶ 7, but it should be noted that the applicable amendment was renumbered 13292, which explicitly relates back to 19258.

## STATEMENT OF MATERIAL FACTS

The material facts are set forth below, as required by Local Civil Rule 7(h), and supported by the attached Bliss Declaration.  There is no genuine dispute of the following material facts:

1.    Plaintiff sent a FOIA request to USTR on December 19, 2007, via email "requesting the full text of the settlement between USTR and the European Union regarding America's online gambling laws."  Complaint ¶ 5.

2.    USTR has only one such document, specifically the "Joint Letter from the United States of America and the European Communities pursuant to paragraph 5 of the Procedures for the implementation of Article XXI of GATS (S/L/80, 29 October 1999)," dated December 17, 2007.  See Bliss Decl. ¶ 5.

3.    USTR withheld the Agreement, citing Executive Order 13292 and FOIA Exemption 1.  See Bliss Decl. ¶¶ 7-12; Complaint ¶¶ 6, 8.

4.    Assistant United States Trade Representative for Services and Investment Julia Christine Bliss classified the Agreement pursuant to Executive Order 13292.  See Bliss Decl. ¶¶ 3, 7-9.

5.    Ms. Bliss determined that "unilateral public release by the United States" of the Agreement at issue would "undermine the ability of the United States to negotiate and conclude trade and investment agreements on terms favorable to U.S. economic and security interests" and "undermine trust by other WTO members in the willingness or ability of the United States to keep negotiating documents confidential."  See Bliss Decl. ¶¶ 11 & 12.

## LEGAL STANDARDS

### I.     Evidentiary Standards for Summary Judgment.

Where no genuine dispute exists as to any material fact, summary judgment is required. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  A genuine issue of material fact is one that would change the outcome of the litigation.  Id. at 247.  "The burden on the moving party may be discharged by 'showing' -- that is, pointing out to the [Court] -- that there is an absence of evidence to support the non-moving party's case."  Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1563 (Fed. Cir. 1987).

Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must instead proffer specific facts showing that a genuine issue exists for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Thus, to avoid summary judgment here, Plaintiff (as the non-moving party) must present some objective evidence that would enable the Court to find he is entitled to relief.  In Celotex Corp. v. Catrett, the Supreme Court held that, in responding to a proper motion for summary judgment, the party who bears the burden of proof on an issue at trial must "make a sufficient showing on an essential element of [his] case" to establish a genuine dispute.  477 U.S. 317, 322-23 (1986).  In Anderson the Supreme Court further explained that "the mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the Plaintiff."  Anderson, 477 U.S. at 252; see also Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir.  1987) (the non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor).

In a FOIA suit, an agency is entitled to summary judgment once it demonstrates that no

material facts are in dispute and that each document that falls within the class requested either

has been produced, not withheld, is unidentifiable, or is exempt from disclosure. Students

Against Genocide v. Dept. of State, 257 F.3d 828, 833 (D.C. Cir. 2001); Weisberg v. U.S. Dept.

of Justice, 627 F.2d 365, 368 (D.C. Cir. 1980). An agency satisfies the summary judgment

requirements in a FOIA case by providing the Court and the Plaintiff with declarations or other

evidence which show that the documents are exempt from disclosure. Hayden v. NSA, 608 F.2d

1381, 1384, 1386 (D.C. Cir. 1979), cert. denied, 446 U.S. 937 (1980); Church of Scientology v.

U.S. Dep't of Army, 611 F.2d 738, 742 (9th Cir. 1980); Trans Union LLC v. FTC, 141 F. Supp.

2d 62, 67 (D.D.C. 2001) (summary judgment in FOIA cases may be awarded solely on the basis

of agency affidavits "when the affidavits describe 'the documents and the justifications for

nondisclosure with reasonably specific detail, demonstrate that the information withheld logically

falls within the claimed exemption, and are not controverted by either contrary evidence in the

record nor by evidence of agency bad faith.'") (quoting Military Audit Project v. Casey, 656 F.2d

724, 738 (D.C. Cir. 1981)). See also McGehee v. CIA, 697 F.2d 1095, 1102 (D.C. Cir. 1983),

modified on other grounds, 711 F.3d 1076 (D.C. Cir. 1983); Public Citizen, Inc. v. Dep't of

State, 100 F. Supp. 2d 10, 16 (D.D.C. 2000), aff'd in part, rev'd in part, 276 F.3d 634 (D.C. Cir.

2002).

## II.    Legal Standards Specific to FOIA.

### A.    Adequate Search.

In responding to a FOIA request, an agency must conduct a reasonable search for

responsive records. Oglesby v. U.S. Dept. of Army, 920 F.2d 57, 68 (D.C. Cir. 1990); Cleary,

Gottlieb, Steen & Hamilton v. Dept. of Health, et al., 844 F. Supp. 770, 776 (D.D.C. 1993);

5

Weisberg v. U.S. Dept. of Justice, 705 F.2d 1344, 1352 (D.C. Cir. 1983). An agency is not required to search every record system, but need only search those systems in which it believes responsive records are likely to be located. Oglesby, 920 F.2d at 68. Consistent with the reasonableness standard, the adequacy of the search is "dependent upon the circumstances of the case." Truitt v. Dept. of State, 897 F.2d 540, 542 (D.C. Cir. 1990).

### B. Segregability.

The Court of Appeals for the District of Columbia Circuit has held that a District Court considering a FOIA action has "an affirmative duty to consider the segregability issue sua sponte." Trans-Pacific Policing Agreement v. United States Customs Service, 177 F.3d 1022, 1028 (D.C. Cir. 1999). The FOIA requires that, if a record contains information that is exempt from disclosure, any "reasonably segregable" information must be disclosed after deletion of the exempt information unless the non-exempt portions are "inextricably intertwined with exempt portions." 5 U.S.C. § 552(b); Mead Data Cent., Inc. v. U.S. Dept. of the Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977).

In order to demonstrate that all reasonably segregable material has been released, the agency must provide a "detailed justification" rather than "conclusory statements." Mead Data, 566 F.2d at 261. The agency is not, however, required "to provide such a detailed justification" that the exempt material would effectively be disclosed. Id. All that is required is that the government show "with 'reasonable specificity'" why a document cannot be further segregated. Armstrong v. Executive Office of the President, 97 F.3d 575, 578-79 (D.C. Cir. 1996). Moreover, the agency is not required to "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal

or no information content." Mead Data, 566 F.2d at 261, n.55.

### C.    Standards for Exemptions 1.

"Exemption 1 provides that the disclosure provisions of the FOIA do not apply to matters that are '(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order.' 5 U.S.C. § 552(b)(1)." Morley v. CIA, 508 F.3d 1108, 1123 (D.C. Cir. 2007); see also Students Against Genocide v. Dep't of State, 257 F.3d 828, 833 (D.C. Cir. 2001). As Morley further explains:

> Although the court has "consistently maintained that vague, conclusory affidavits, or those that merely paraphrase the words of a statute, do not allow a reviewing judge to safeguard the public's right of access to government records," Church of Scientology of Cal., Inc. v. Turner, 662 F.2d 784, 787 (D.C. Cir. 1980) (*per curiam*), the text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified. Morley's argument for declassification does not overcome the "*substantial weight*" the court must accord "to an agency's affidavit concerning the details of the classified status of the disputed record." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981) (emphasis in original) (internal quotation marks omitted).

Id. at 1124. Thus, to sustain its withholding of the Agreement, USTR needs to show only that (1) the Agreement was classified, and (2) the agency's decision to classify it complies with the criteria in Executive Order 13292.

## ARGUMENT

### I.    USTR Properly Withheld the Agreement under Exemption 1.

USTR invoked Exemption 1, relying on Executive Order 13292 (modifying Exec. Order 12958) (hereinafter "Order," copy attached hereto). First, USTR's declaration establishes that the Agreement was classified by an official with authority to classify it. See Bliss Decl. ¶¶ 3, 7-

9.  Thus, USTR satisfies the requirement that the Agreement was actually classified.

Next, Executive Order 13292 imposes several conditions for classifying information, all of which are satisfied in this case.  Specifically, in setting out "Classification Standards," the Order provides:

> Information may be originally classified under the terms of this order only if all of the following conditions are met:
> (1) an original classification authority is classifying the information;
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Exec. Order 13292, § 1.1 (a).  The Bliss Declaration establishes that she classified the Agreement, see Decl. ¶¶ 7-9; that she has original classification authority, see id. ¶ 3, Order § 1.2(2); that the Agreement "is under the control of the United States Government," id. ¶ 8a.; and that the Agreement "concerns . . . foreign government information," a category of information that may be classified under Section 1.4(b) of the Order, see Order §§ 1.4(b), 6.1(r)(2) and Bliss Decl. ¶ 7.  In particular, the Bliss Declaration notes that the United States and the European Communities produced the Agreement pursuant to an arrangement under the WTO, under which documents of this kind must be held in confidence.  See id. ¶¶ 6-7.  Therefore, the Agreement qualifies as "foreign government information" under the Order.

Finally, the Order specifically provides: "The unauthorized disclosure of foreign government information is presumed to cause damage to the national security."  Id. § 1.1(c). This should end the inquiry in favor of USTR's withholding, in the absence of evidence of bad

faith by the agency.

Here, however, the Bliss Declaration goes beyond the presumption and explains that "disclosure of the information reasonably could be expected to result in damage to the national security," per Order § 1.1(a)(4):

> [U]nilateral public release by the United States of information contained in a WTO "secret" document would damage the trust that other WTO members have in the United States to protect trade negotiating documents that are exchanged with the expectation that they will be kept confidential. That, in turn, would undermine the ability of the United States to negotiate and conclude trade and investment agreements on terms favorable to U.S. economic and security interests.
>
> In my experience, foreign governments are typically willing to engage in the give-and-take of negotiations with the United States necessary to conclude trade and investment agreements only if they can rely on assurances from the United States that it will not unilaterally disclose to the public information exchanged in confidence in the course of the negotiations. A unilateral disclosure by the United States of a WTO "secret" document -- including one that the United States and another WTO member jointly produced -- would violate the confidentiality arrangements provided for under the WTO. Such a disclosure would undermine trust by other WTO members in the willingness or ability of the United States to keep negotiating documents confidential.

Bliss Decl. ¶¶ 11-12. Thus, USTR has identified with particularity the damage to national that would ensue if the United States were to release the Agreement to the public and thereby breach its WTO obligation to keep it confidential. Specifically, such a release would undermine the trust between the United States and other WTO members which this country relies upon to conclude international trade agreements that secure its national economic interests. See Miller v. DOJ, --- F. Supp. 2d ---, 2008 WL 2544659 *6 (D.D.C. 2008) (Kennedy, J.) (accepting State Department's concern for "confidentiality and mutual trust [as] essential to successful diplomatic exchanges" in applying Exec. Order 13292 and Exemption 1). In light of the "substantial weight," per Morley, that the Court is to give the agency's determination of classification decisions like the one made here, this suffices to prove that the USTR's decision to classify the

Agreement complies with the standards of the Order's classification standards.  Therefore, USTR

has proven that its withholding of the Agreement was proper under FOIA Exemption 1.

## II.    USTR Complied with Search and Segregability Requirements.

There should be no dispute that the USTR conducted an adequate search for the

Agreement for the simple reason that Plaintiff requested a single document and USTR located it.

See Bliss Decl. ¶ 4; accord Complaint ¶ 1, 5-9 (referring to one document).  There is neither any

apparent ambiguity in the request, nor any reason to justify further search efforts by USTR.

Finally, USTR properly considered the issue of segregability of factual information.  As

explained in the agency's declaration:

> [T]he procedures specified in paragraph 5 of Council document S/L/80 call for
> agreements and reports negotiated under GATS Article XXI:2(c) to be treated as "secret"
> in their entirety.  Accordingly, a unilateral release by the United States of portions of the
> joint letter and report would breach those procedures.  Accordingly, it is my conclusion
> that there are no segregable portions of the joint letter and report that can be released.

Bliss Decl. ¶ 13.  This determination was as specific as could be, given the controlling

requirement of secrecy and the explanation provided is sufficiently thorough and factual.

## CONCLUSION

For these reasons, Defendant asks the Court to award summary judgment to Defendant.

July 9, 2008                                Respectfully submitted,

_____

JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

  /s/
_____

RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

10

_/s/_
ALAN BURCH, D.C. Bar # 470655
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-7204
alan.burch@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ED BRANTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-855 (RMU) |
| | ) | |
| OFFICE OF THE U.S. TRADE | ) | |
| REPRESENTATIVE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF JULIA CHRISTINE BLISS

I, Julia Christine Bliss, do hereby state and declare:

1.      I am the Assistant United States Trade Representative for Services and Investment in the Office of the United States Trade Representative (USTR).  I have served in this position since February 2005.  As part of my duties, I oversee all bilateral, regional, and multilateral negotiations on services and investment that the United States conducts.  Before assuming my current position, I served as Deputy Assistant USTR for Services.  I am therefore familiar with the conduct of and expectations related to international services and investment negotiations.

2.      The statements made in this declaration are based on knowledge that I have acquired in the performance of my official duties, information provided to me by USTR personnel, as well as my specific experience related to negotiations under Article XXI of the World Trade Organization (WTO) *General Agreement on Trade in Services* (GATS) regarding United States commitments under the GATS with respect to gambling services.

3.      By virtue of my position, I have original classification authority at the "Secret" level.

4.      On the basis of agency records, kept in the normal course of its operations and contemporaneously with the receipt of the Freedom of Information Act request that is the subject of this case, I understand that the USTR FOIA officer received the attached FOIA request on December 19, 2007. See Exhibit 1.  It was forwarded to my office that same day.  Staff in my office had been involved in the negotiations under GATS Article XXI and were able readily to identify the document that was the subject of the request.  Since the request called for a distinct document and we had it, no additional search was required.

5.      On December 17, 2007, as a result of an effort by the United States to clarify its commitments under the GATS regarding trade in gambling services, representatives of the

United States and the European Union signed a *Joint Letter from the United States of America and the European Communities pursuant to paragraph 5 of the Procedures for the implementation of Article XXI of GATS (S/L/80, 29 October 1999)*, with a report attached, and provided a copy to WTO Council on Trade in Services. The letter addressed certain adjustments that the United States proposed to make to its schedule of commitments under the GATS. Adjustments of the type set out in the letter are provided for in Article XXI of the GATS. Specifically, Article XXI:2(a) provides that when a WTO member seeks to modify its GATS commitments, it must enter into negotiations with each WTO member that may be affected by the proposed modification with a view to providing "compensatory adjustments" (*i.e.*, offsetting trade concessions) to that the member.

6.      The Council for Trade in Services, which oversees the GATS, has adopted procedures for modifying GATS schedules to reflect modifications in GATS commitments. Those procedures are set out in Council document S/L/80, *Procedures for the Implementation of Article XXI of the General Agreement on Trade in Services (GATS)*, see Exhibit 2, which the United States and other members of the GATS Council agreed to in 1999. Paragraph 5 of the procedures provides that "[u]pon completion of each negotiation conducted under paragraph 2(a) of Article XXI, the modifying Member shall send to the [WTO] Secretariat a joint letter signed by the Members concerned together with a report concerning the results of the negotiations[.]" Id. Paragraph 5 further provides that "[t]he Secretariat will distribute the letter and the report to all Members in a *secret* document." Id. (emphasis added.)

7.      I concluded that the joint letter and report should be classified as "foreign government information" under category 1.4(b) of Executive Order 12958, as amended ("the Executive Order"), consistent with their status as WTO "secret" documents under paragraph 5 of the Council procedures. Section 6.1(r) of that Executive Order defines "foreign government information" to include "information produced by the United States Government pursuant to or as a result of a joint arrangement with a foreign government or governments, or an international organization of government, or any element thereof, requiring that the information, the arrangement, or both are to be held in confidence."

8.      After considering the matter, I concluded, pursuant to Section 1.1(a) of the Executive Order, that the joint letter and report:

   a. were owned by, produced by or for, or were under the control of the United States Government;

   b. contain information that falls within the category of 1.4(b) of the Executive Order; and

   c. contain information the unauthorized disclosure of which reasonably could be expected to result in damage to the national security, as defined by the Executive Order.

9.      Therefore, consistent with the Executive Order, I classified the information in the joint letter and report at the "Confidential" level and ensured that the document was properly marked.

10.     I affirm that I did not classify the information in the joint letter and report for any of the reasons prohibited by Section 1.7 of the Executive Order. Specifically, I did not classify the information in order to (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interests of the national security.

11.     Sec. 1.1(c) of the Executive Order provides that "(T)he unauthorized disclosure of foreign government information is presumed to cause damage to the national security." In my judgment, unilateral public release by the United States of information contained in a WTO "secret" document would damage the trust that other WTO members have in the United States to protect trade negotiating documents that are exchanged with the expectation that they will be kept confidential. That, in turn, would undermine the ability of the United States to negotiate and conclude trade and investment agreements on terms favorable to U.S. economic and security interests.

12.     In my experience, foreign governments are typically willing to engage in the give-and-take of negotiations with the United States necessary to conclude trade and investment agreements only if they can rely on assurances from the United States that it will not unilaterally disclose to the public information exchanged in confidence in the course of the negotiations. A unilateral disclosure by the United States of a WTO "secret" document – including one that the United States and another WTO member jointly produced – would violate the confidentiality arrangements provided for under the WTO. Such a disclosure would undermine trust by other WTO members in the willingness or ability of the United States to keep negotiating documents confidential. I am unaware of any instance in which USTR has released to the public a "WTO secret" document in response to a FOIA request.

13.     Finally, the procedures specified in paragraph 5 of Council document S/L/80 call for agreements and reports negotiated under GATS Article XXI:2(c) to be treated as "secret" in their entirety. Accordingly, a unilateral release by the United States of portions of the joint letter and report would breach those procedures. Therefore, it is my conclusion that there are no segregable portions of the joint letter and report that can be released.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of July, 2008.

Julia Christine Bliss

## Caldwell, Jacqui

**From:**     Ed Brayton [ebrayton@crystalauto.com]
**Sent:**     Wednesday, December 19, 2007 4:18 PM
**To:**       Caldwell, Jacqui
**Subject:** FOIA request

My name is Ed Brayton. I am a fellow with the Center for Independent Media and a reporter for the Michigan Messenger. This is an official request under the Freedom of Information Act. The document I wish to receive is the full text of the settlement between the USTR and the European Union regarding America's online gambling laws. It is the document referred to in the following Reuters article:

http://news.yahoo.com/s/nm/20071217/wl_canada_nm/canada_usa_trade_gambling_col

Since the agreement was just announced publicly by the USTR spokesperson, it should not require much of a search to find it. Thank you.

Ed Brayton

12/19/2007

# WORLD TRADE

# ORGANIZATION

S/L/80
29 October 1999

(99-4714)

**Trade in Services**

## PROCEDURES FOR THE IMPLEMENTATION OF ARTICLE XXI OF THE GENERAL AGREEMENT ON TRADE IN SERVICES (GATS)

## (MODIFICATION OF SCHEDULES)

Adopted by the Council for Trade in Services on 19 July 1999

Notification of Modification or Withdrawal

1.      A Member intending to modify or withdraw a scheduled commitment in accordance with Article XXI (the "modifying Member") shall transmit a notification to that effect, no later than three months before the intended date of implementation of such modification or withdrawal, to the Secretariat which will distribute the notification to all other Members in a secret document. The intention by a Member to modify or withdraw scheduled commitments shall be included in the agenda of the next meeting of the Council for Trade in Services.

2.      The notification shall include a list of the commitments which it is intended to modify or withdraw.  For each such commitment the notification shall indicate whether the intention is to modify or to withdraw it, in whole or in part;  the proposed date for implementing such modification or withdrawal;  and the exact nature of any proposed modification.

Negotiations on Compensation

3.      Any Member which considers that its interests under the Agreement may be affected by the proposed modification or withdrawal ("affected Member") shall communicate its claim in writing to the modifying Member and at the same time notify it to all other Members through the Secretariat. Such claims of interest must be made no later than 45 days after the date of circulation by the Secretariat of the notification referred to in paragraph 1 above.  If by that date no Member has submitted a claim that it is an affected Member, the modifying Member shall be free to implement the proposed modification or withdrawal, after completing the certification procedure under paragraphs 20 to 22 and shall submit a notification of the date of such implementation to the Secretariat, for circulation to the Members of the WTO.

4.      The modifying Member and any affected Member which has identified itself under paragraph 3 above shall negotiate with a view to reaching agreement within three months following the last date on which such a claim of interest may be made.  This period of negotiation may be extended by mutual agreement and the terms of such an agreement, including the period of extension, shall be notified to all other Members through the Secretariat.

5.      Upon completion of each negotiation conducted under paragraph 2(a) of Article XXI, the modifying Member shall send to the Secretariat a joint letter signed by the Members concerned, together with a report concerning the results of the negotiations which shall be initialled by the Members concerned.  The Secretariat will distribute the letter and the report to all Members in a secret document.

6.      A modifying Member which has reached agreement with all Members that had identified themselves under paragraph 3 above shall, no later than fifteen days after the conclusion of the negotiations, send to the Secretariat a final report on negotiations under Article XXI, which will be distributed to all Members in a secret document.  After completing the certification procedure under paragraphs 20 to 22, such a modifying Member will be free to implement the changes agreed upon in the negotiations and specified in the report, and it shall notify the date of implementation to the Secretariat, for circulation to the Members of the WTO.  Such changes shall not exceed the modification or withdrawal initially notified and shall include any compensatory adjustment agreed upon in the negotiations.

Arbitration

7.      If the modifying Member and a Member that had identified itself under paragraph 3 above do not reach agreement by the end of the period of negotiations referred to in paragraph 4, such an affected Member may request arbitration.  Such a request shall be made in writing to the modifying Member and the Secretariat no later than 45 days after the end of that period.

8.      If no Member that had identified itself under paragraph 3 above submits a timely arbitration request under paragraph 7, the modifying Member shall be free to implement the proposed modification or withdrawal, after completing the certification procedure under paragraphs 20 to 22. In cases where agreement has been reached with some but not all affected Members and no request for arbitration has been made, the modifying Member shall be free to implement in accordance with the procedures of paragraph 6 above, after completing the certification procedure under paragraphs 20 to 22, the proposed modification or withdrawal with the compensatory adjustments agreed upon in the negotiations, but not exceeding the proposed modification or withdrawal initially notified. The modifying Member shall notify the date of implementation to the Secretariat, for circulation to the Members of the WTO.

9.      If an affected Member submits a timely arbitration request under paragraph 7, the modifying Member shall not implement any modification or withdrawal until it has received the arbitration body's findings and is in conformity with those findings.

10.      The appointment of the arbitration body shall be subject to mutual agreement of the parties concerned.  If the parties to the arbitration cannot agree on the arbitration body within twenty days from the date of request for the arbitration, the arbitration body shall be appointed at the request of any party by the Director-General of the WTO, after consulting the parties, within ten days thereafter. The arbitration body shall consist of three arbitrators, unless the parties agree to a different uneven number.  The arbitration body shall be chosen from among persons with relevant legal, economic, financial or technical expertise, including expertise in the agreement, with respect to the matter referred to the arbitration body.  Except as the parties otherwise agree, the arbitration body shall not consist of citizens of any of the parties to the arbitration.  Where a party to an arbitration is a developing country Member, the arbitration body shall, if the developing country Member so requests, include at least one arbitrator from a developing country Member.

11.      The "Rules of conduct for the understanding on rules and procedures governing the settlement of disputes" shall apply.  The arbitration body may seek information from any relevant source and may consult experts to obtain their opinion on certain aspects of the matter.  The arbitration body shall inform the parties to the arbitration of any consultations with experts.  There shall be no *ex parte* communications with the arbitration body concerning matters under consideration by the arbitration body.

12.      Any affected Member that wishes to enforce a right that it may have to compensation must participate in the arbitration.  However, if an affected Member having reached an agreement with the

modifying Member under paragraph 4 above were to decide not to participate in the arbitration, it shall nonetheless be deemed to have participated in the arbitration with respect to the modification or withdrawal in question.

13.    The arbitration body shall have the following terms of reference unless the parties to the arbitration agree otherwise within ten days from the request for arbitration:

> "To examine the compensatory adjustments offered by (name of modifying Member) or requested by (affected Member requesting the arbitration) and to find a resulting balance of rights and obligations which maintains a general level of mutually advantageous commitments not less favourable to trade than that provided for in Schedules of specific commitments prior to the negotiations.  In such examination, the Arbitration body shall take into account any agreement reached, in negotiations under paragraph 4. above, between the modifying Member and any affected Member".

14.    The arbitration body's findings shall be communicated to the parties to the arbitration through the Secretariat within three months of the appointment of the arbitration body.

15.    When an arbitration has been conducted in accordance with paragraphs 7 through 14 above, the modifying Member shall be free to implement a modification or withdrawal which is in conformity with the findings of the arbitration body after completing the certification procedure under paragraphs 20 to 22, and shall notify the date of implementation to the Secretariat for circulation to the Members of the WTO together with the findings of the arbitration.

16.    If the modifying Member implements its proposed modification or withdrawal and does not comply with the findings of the arbitration, any affected Member that participated in the arbitration may modify or withdraw substantially equivalent benefits in conformity with those findings. Notwithstanding Article II, such a modification or withdrawal may be implemented solely with respect to the modifying Member.

17.    The affected Member shall notify the Council for Trade in Services of the measures it intends to take in accordance with paragraph 16, one month before exercising its right to take these measures.

18.    Modifications or withdrawals implemented in accordance with paragraph 16 shall be terminated if the modifying Member complies with the findings of the arbitration body under paragraph 14.

19.    The modifying Member may withdraw at any time its notification under Article XXI:1 of the Agreement and paragraph 1 above, by notice to the Secretariat.  Upon receipt of such a withdrawal, Article XXI and these procedures shall cease to apply and the modifying Member shall be obligated to maintain the commitment in question in conformity with its Schedule and Part III of the Agreement.

Formal aspects of the procedures for modification of schedules of commitments

20.    Modifications in the authentic texts of Schedules annexed to the GATS which result from action under Article XXI, shall take effect by means of Certification.  The draft schedule clearly indicating the details of the modifications shall be communicated to the Secretariat for circulation to all Members.  The modifications shall enter into force upon the conclusion of a period of 45 days from the date of their circulation or on a later date to be specified by the modifying Member, provided no objection has been raised by a Member on the ground that the draft schedule does not correctly reflect the results of the action under Article XXI and/or that the modification or withdrawal contained in the draft schedule exceed those initially notified.  A Member making an objection should

to the extent possible identify the specific elements of the modifications which gave rise to that objection. At the end of the 45-day period, if no objection has been raised, the Secretariat shall issue a communication to all Members to the effect that the Certification procedure has been concluded, indicating the date of entry into force of the modifications.

21.    Any Member wishing to object shall submit a notification to that effect to the Secretariat for circulation to all Members and shall enter into consultations with the modifying Member with a view to reaching a satisfactory resolution of the matter as soon as possible. When an objection has been notified, the Certification procedure shall be deemed concluded upon the withdrawal of the objection by the objecting Member or the expiry of the period in which objections may be made, whichever comes later. Such a withdrawal shall be communicated to the Secretariat. When more than one objection has been raised, the Certification will be deemed concluded upon the withdrawal of the objections by all objecting Members. The Secretariat shall issue a communication informing all Members of the withdrawal of the objection(s) and the conclusion of the Certification procedure, indicating the date of entry into force of the modifications.

22.    If the consultations referred to in paragraph 21 result in any changes to the draft schedule submitted for Certification, the modifying Member shall promptly submit them to the Secretariat for circulation to all Members. This modification shall enter into force provided no objection has been raised by a Member within 15 days from the date of its circulation or on later date to be specified by the modifying Member, on the grounds referred to in paragraph 20. A Member making an objection should to the extent possible identify the specific elements of the modification which gave rise to that objection. If no objection is raised by the end of the 15-day period, the Secretariat shall issue a communication to all Members to the effect that the Certification procedure has been concluded, indicating the date of entry into force of the modifications. If an objection has been raised, the procedure described in paragraph 21 shall apply.

General Provisions

23.    In the application of these procedures Members shall take full account of the special situations of individual developing countries, in particular the least developed countries.

24.    Following the lapse of three years from entry into force of these Procedures, the Council for Trade in Services shall, at the request of any Member, review the operation of these Procedures. In such a review, the Council for Trade in Services may agree to amend any of the provisions of the Procedures, including those relating to arbitration.

_____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ED BRAYTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 08-0855 (RMU) |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICE OF THE UNITED STATES | ) | |
| TRADE  REPRESENTATIVE, | ) | |
| | ) | |
| Defendant. | ) | |

## **ORDER GRANTING SUMMARY JUDGMENT**

UPON CONSIDERATION of Defendant's Motion for Summary Judgment, any

opposition thereto, and the entire record herein, it is hereby

ORDERED that the Motion is GRANTED, and it is further

ORDERED that the summary judgment is entered in favor of Defendant.

This is a final and appealable order.  So ordered, this _____ day of June, 2008.


_____
RICARDO M. URBINA
United States District Judge