UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ED BRAYTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0855 (RMU) |
| | ) | |
| OFFICE OF THE UNITED STATES | ) | |
| TRADE REPRESENTATIVE, | ) | |
| | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This action is brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel the defendant Office of the United States Trade Representative ("USTR") to produce a copy of the compensation settlement agreement between USTR (on behalf of the United States) and the European Union ("EU") announced by USTR on December 17, 2007. Although USTR publicly announced the settlement, it has not released its text to the public.

The U.S. - EU compensation settlement agreement was reached in response to the United States's decision to amend its "schedule of commitments" under the General Agreement on Trade in Services ("GATS")—an agreement enforced by the World Trade Organization ("WTO")—to exclude the U.S. gambling and betting service sector. The schedule of commitments contains the list of service sectors in the U.S. economy (*e.g.*, financial services, communication services, tourism and travel services, etc.) that the United States has committed to WTO rules and jurisdiction. As explained below, once a service sector is committed to WTO GATS jurisdiction, a WTO signatory country is obliged to "ensure the conformity of its laws,

regulations and administrative procedures" with the GATS rules.  Declaration of Mary Bottari ("Bottari Decl.") ¶ 2.  If a WTO member's domestic policies operate (whether intentionally or inadvertently) in a manner that conflicts with GATS rules, such policies can be challenged before a WTO dispute resolution tribunal, which is empowered to order WTO member nations to bring their policies into conformity with WTO obligations and to authorize trade sanctions if they fail to do so.  Before a WTO member, such as the United States, can withdraw a service sector from its schedule of GATS commitments, as the United States is now doing with respect to its gambling and betting services sector, it must compensate interested WTO member nations for future lost revenue, such as through monetary compensation or the grant of new WTO concessions.  The document sought in this FOIA lawsuit is the compensation settlement agreement that USTR announced the United States had reached with the EU.  According to USTR's press release, in its agreement with the EU and other WTO members, the United States promised to add new service sectors of the U.S. economy to its schedule of GATS commitments in exchange for the exclusion of its gambling and betting services sector.

Because a decision by the United States to add or modify a commitment regarding a particular U.S. service sector potentially has serious, sometimes unintended, ramifications for domestic public policy, the importance of subjecting to public scrutiny and debate U.S. decisions to commit particular service sectors to GATS obligations cannot be overstated.  FOIA is the public's bulwark against the development of secret law in the United States, and here it requires USTR to release the compensation settlement agreement the United States reached with the EU.

## SUMMARY OF ARGUMENT

On December 19, 2007, plaintiff Ed Brayton submitted a FOIA request to USTR seeking the U.S. - EU compensation settlement agreement.  Citing FOIA Exemption 1, 5 U.S.C. § 552(b)(1), USTR withheld the single document, a joint letter and report executed by the United States and the EU, that it maintains is responsive to the request.  *See* Declaration of Ed Brayton ("Brayton Decl.") ¶¶ 2-5; Declaration of Julia Christine Bliss ("Bliss Decl.") ¶¶ 4-13.  The agency argues that the compensation agreement was properly classified as "foreign government information" pursuant to section 1.4(b) of the governing Executive Order because it is "information produced by the United States Government pursuant to or as a result of a joint arrangement with a foreign government or governments, or an international organization of governments, or any element thereof, requiring that the information, the arrangement, or both, are to be held in confidence."  Executive Order ("EO") 13292 § 6.1(r)(2), cited in Defendant's Memorandum ("Def. Mem.") at 2, 8; Bliss Decl. ¶ 7; *see also* Brayton Decl., Exh. C (USTR letter dated Mar. 25, 2008 denying plaintiff's administrative appeal).  According to USTR, procedures governing the modification of GATS schedules of commitments *require* that a modifying member nation (here, the United States) keep secret from its own citizens a compensation agreement in which it promises to make various changes to its schedule of GATS commitments, at least until the modifications to the schedule of commitments are actually made, when it is too late for public scrutiny.

Public release of the United States's compensation settlement agreement, USTR maintains, will damage U.S. national security—not because of the content of any information contained in that agreement, but because the disclosure allegedly would undermine trust by other

WTO members in the willingness or ability of the United States to keep "secret" WTO

"negotiating documents" confidential.  Def. Mem. at 9; Bliss Decl. ¶¶ 11-12.  Furthermore,

USTR insists that because WTO procedures allegedly call for agreements and reports negotiated

under GATS Article XXI to be treated as "secret" in "their entirety," "there are no segregable

portions" of the withheld document that may be released.  Def. Mem. at 10; Bliss Decl. ¶ 13.

USTR is wrong on all three counts.  First, the U.S. - EU compensation agreement does

not qualify as foreign government information under the Executive Order.  The WTO rules

governing the modification of a country's GATS schedule of commitments do not require that

the modifying country keep its compensation agreements confidential.  The requirement of

secrecy is imposed only on the WTO Secretariat, an administrative body with no formal

decisionmaking authority whose mission is to carry out ministerial tasks with discretion.  The

rules are silent with respect to whether the WTO member nations themselves must keep the

information in confidence; the members are not "required" to do so.  Thus, the definition of

foreign government information upon which USTR relies is inapplicable.

Second, even if the compensation agreement could be considered foreign government

information, classification of the document would still be unjustified because disclosure would

not cause the requisite damage to national security.  USTR makes no claim that the compensation

agreement is content-sensitive.  Instead, it argues, without factual support, that because this

compensation agreement is a "negotiating document," its premature release would undermine the

ability of the United States to negotiate trade agreements on terms favorable to U.S. economic

and security interests.  But the settlement plaintiff seeks is not a "negotiating document," as

USTR contends, but the *final product* of U.S. - EU negotiations—an agreement announced

4

publicly by the agency itself. The United States routinely makes public its submissions before international trade dispute resolution bodies, including WTO panels, and has publicized U.S. offers in WTO negotiations, all of which are far less final and arguably more sensitive than a publicly announced agreement. USTR's claim that release of the United States's own settlement agreement will damage U.S. national security is conclusory and farfetched. Finally, in the unlikely event that USTR could establish that disclosure of certain portions of the document would harm national security, the agency has not supported its assertion that *no* part of the compensation agreement may be segregated and released. At the least, the specific commitments made by the United States in the agreement should be made available to the public.

The compensation settlement withheld by USTR spells out promises by the United States to commit new service sectors to WTO GATS jurisdiction to compensate for its withdrawal of the gambling and betting services sector—an agreement that may have serious consequences for domestic policy. *See* Bottari Decl. ¶¶ 17-20. USTR's refusal to release these documents flies in the face of FOIA, which was enacted to prevent the adoption of such secret law. This Court should grant summary judgment in plaintiff's favor and order USTR to release the compensation settlement agreement.

## STATEMENT OF FACTS

The following background information regarding the WTO, GATS, and the Internet gambling dispute that led the United States to modify its schedule of commitments places plaintiff's FOIA request in context.

**1.      The Antigua - U.S. Cross-Border WTO Gambling Dispute.** Established in 1995 as a successor to the 1947 General Agreement on Tariffs and Trade ("GATT"), the WTO is

a 153-member international organization based in Geneva. The WTO enforces agreements, negotiated and signed by many of the world's nations, that cover trade in goods, market access and regulation of services, foreign investors and investment, intellectual property, procurement, product and food safety, and other policies. Bottari Decl. ¶ 2. These agreements set the legal rules for international commerce among signatory states. *Id.* ¶¶ 2-6. The United States is a member of the WTO and, as such, is legally bound by the rules contained in these trade agreements. *Id.* ¶ 2. As a result, the other 152 WTO signatory countries are empowered to challenge nonconforming U.S. federal and state policies as GATS violations before trade tribunals through the WTO's binding dispute resolution system. *Id.* The goal of the WTO and its underlying agreements is to "liberalize" international commerce by eliminating "barriers" to trade and investment among nations. The WTO has proved to be controversial and is frequently criticized as a nontransparent and undemocratic institution operating in a manner that values opening markets for the benefit of multinational corporations more than member states' rights to regulate for the public good. *Id.* ¶ 3.

The key trade agreement relevant to this FOIA dispute is GATS, a binding international commercial pact enforced by the WTO. *Id.* ¶ 4.[1] GATS governs trade in services among member nations and their service consumers and providers. Its rules apply to service sectors of the economy that member nations sign up, or "commit," to be bound by the terms of the agreement. *Id.* ¶ 5; GATS Art. XX. For example, the United States has committed in its official GATS schedule of commitments almost 100 service sectors, such as financial services (including

---

[1] GATS is available at http://www.wto.org/english/docs_e/legal_e/26-gats_01_e.htm. The texts of the various agreements enforced by the WTO are available at http://www.wto.org/english/docs_e/legal_e/legal_e.htm.

health insurance), communications services, business and professional services, distribution services, transportation services.  Bottari Decl. ¶ 5.  For all committed service sectors, subject to any reservations specified in the schedule and other exceptions specified in GATS, the member nation commits to conform its domestic policy to the constraints and obligations included in the GATS text.  For example, the member nation commits to provide market access to foreign service providers and to accord such services and their suppliers "national treatment"—that is, treatment that is "no less favourable" than the member would accord its own like services and service suppliers.  Also included are additional limits on domestic regulation of such services.  Bottari Decl. ¶ 6; *see* GATS Art. VI (Domestic Regulation), Art. XVI (Market Access), Art. XVII (National Treatment).

The objective of GATS is to guarantee foreign service providers access to other WTO members' markets.  Domestic policies that conflict, whether intentionally or unintentionally, with the constraints and obligations established in the GATS text are subject to challenge through the binding dispute resolution system built into the WTO.  Bottari Decl. ¶ 6; *see* GATS Art. XXIII (Dispute Settlement and Enforcement).  Domestic policies that are successfully challenged as violating the member nation's GATS obligations must be brought into conformity with GATS rules.  If a WTO member fails to do so, the WTO dispute resolution body can authorize commercial sanctions against that country.  Bottari Decl. ¶¶ 2, 6.  In effect, then, GATS rules proscribe its members' domestic laws in covered service sectors to the extent that they are inconsistent with GATS rules.  GATS rules apply to measures taken by WTO member nations, including those taken by central, regional, or local government authorities, as well as those taken by non-governmental bodies in the exercise of powers delegated by central, regional, or local

7

governments or authorities.  *Id.* ¶ 4; GATS Art. I.   Thus, in the case of the United States, a diverse array of federal, state, and local domestic laws that inadvertently constrain foreign service providers' activities or operations in the U.S. market or impede cross-border trade in services may potentially be considered actionable barriers and potential violations of GATS rules enforceable by the WTO.  Bottari Decl. ¶ 4.

The inclusion by the United States of particular service sectors in its GATS schedule of commitments can have significant, sometimes unintended, domestic policy ramifications, thus highlighting the importance of subjecting to public scrutiny and debate U.S. decisions to commit a particular service sector under GATS.  The long-running dispute between the Caribbean island nation of Antigua and the United States over cross-border, or remote, access to gambling and betting services (such as via the Internet), described in the Declaration of Mary Bottari, is a case-in-point and forms the backdrop to the compensation settlement agreement that plaintiff seeks here.

Internet gambling became a booming industry in the 1990s, and Antigua capitalized on that boom, marketing heavily to U.S. customers.  Bottari Decl. ¶ 8.  In 2003, after a U.S. crackdown on an Antiguan Internet gambling firm, Antigua sued the United States for relief before a formal WTO dispute resolution panel.  Antigua contended that the cumulative impact of three U.S. federal anti-racketeering laws prevented Antiguan-domiciled gambling providers from offering gambling and betting services to U.S. customers.[2]  In response, U.S. trade lawyers argued that the United States had not included the gambling and betting sector in its schedule of

_____

[2]  The three federal laws were the Wire Act, 18 U.S.C. § 1084; the Travel Act, 18 U.S.C. § 1952; and the Illegal Gambling Business Act ("IGBA"), 18 U.S.C. § 1955.  Bottari Decl. ¶ 9.

commitments under GATS and that, accordingly, its gambling laws were not subject to WTO rules. *Id.* ¶ 9.

In 2004, a WTO panel ruled against the United States, and in April 2005, the WTO Appellate Body upheld that ruling. *Id.* ¶ 10. The Appellate Body found that, regardless of U.S. intent, the U.S. gambling and betting services sector was encompassed within "other recreational services," which the United States had "committed" to comply with WTO rules without reservation. The Appellate Body held that restrictions amounting to a total ban on several or all means of delivery of cross-border gambling services (including Internet gambling) constituted a "zero quota" that violated GATS "market access" obligations. *Id.*

The Appellate Body held that U.S. laws would have been exempt from the GATS market access requirements under an exemption for laws "necessary to protect public morals or to maintain order," *see* GATS Art. XIV, except that it found that the U.S. restrictions were applied in a discriminatory manner, rendering the exemption inapplicable. Bottari Decl. ¶ 11. The U.S. Interstate Horseracing Act ("IHA"), 15 U.S.C. § 3002, authorizes, under certain conditions, interstate off-track wagers on horseraces placed or transmitted in one state and accepted in the same or another state. The Appellate Body construed that statute as authorizing *domestic* service suppliers, but not *foreign* service suppliers, to offer remote betting services for horse races. Because it believed that the IHA appeared to provide a domestic exception to the general prohibition on cross-border gambling services, which was adversely affecting Antigua, the Appellate Body ruled that the United States's anti-gambling laws were discriminatory and did not qualify for the "public morals" exemption. Bottari Decl. ¶ 11. In other words, the United States's anti-gambling laws violated its market access commitments under GATS unless the

discriminatory exception in the IHA was eliminated.  Thus, to comply with the ruling, the United States had little choice but either to repeal its restrictions on cross-border access to gambling or repeal the exception allowed for cross-state offsite horserace gambling.  *Id.* ¶ 12.

The United States did not change its federal gambling laws, and, in March 2007, the WTO panel ruled that the United States had failed to bring its laws into compliance with the Appellate Body's decision.  Its decision opened the door to recovery of sanctions by Antigua; other WTO countries threatened to launch new WTO challenges to other U.S. gambling policies.  *Id.* ¶ 14.

Although this particular WTO dispute involved cross-border access to gambling services, the Appellate Body's reasoning was far-reaching in its regulatory implications.  As a result of the WTO ruling, an array of common regulations relating to gambling were put at risk of challenge under the WTO, such as limits on the number of service suppliers (*e.g.*, the number of casinos), monopolies (*e.g.*, monopolistic state lotteries), and exclusive service provider arrangements (*e.g.*, Indian gaming compacts).  *Id.* ¶ 12.  And although the Appellate Body held that insufficient evidence had been presented to warrant consideration of whether gambling restrictions enacted by several states *also* violated the U.S. commitment under GATS, its decision that the United States had committed its gambling and betting service sector and that regulatory bans were considered a "quota of zero" meant that state bans on gambling also were at risk of challenge under the WTO.  *Id.*  In response to the WTO decision, 29 state attorneys general wrote a letter to USTR raising serious concerns about the ruling's implications for state regulation of gambling in particular and for state regulatory authority in general.  *Id.* ¶ 13; *see* http://www.citizen.org/documents/29AGs_GATS_May2005.pdf (State Attorneys General Letter).

10

    **2.**      **U.S. Modification of its GATS Commitments.** Facing the prospect of WTO sanctions, on May 4, 2007, USTR publicly announced that the United States had notified the WTO that it was invoking procedures under GATS Article XXI that would permit it to modify its commitment regarding "other recreational services" to exclude gambling and betting services. Bottari Decl. ¶ 15; *see* http://www.ustr.gov/Document_Library/Press_Releases/2007/ May/Section_Index.html (USTR May 4, 2007 press release). GATS Article XXI permits a member state to modify or withdraw a service sector committed to WTO jurisdiction, but only with the authorization of other WTO member countries interested in that service sector and only after compensating those interested countries for future lost revenue, such as through monetary compensation or the grant of new WTO concessions. Under GATS Article XXI.2, "the modifying member"—here, the United States—must "enter into negotiations with a view to reaching agreement on any necessary compensatory adjustment." If agreement is not reached between the modifying member and an affected member, the affected member may refer the matter to arbitration. GATS Art. XXI.3; *see* Bottari Decl. ¶ 15.

    The United States entered into compensation negotiations with several interested countries. Compensation talks occurred behind closed doors. Bottari Decl. ¶ 16. On December 17, 2007, USTR issued a public statement announcing that it had reached a settlement under the GATS Article XXI process with Canada, the European Union, and Japan. As USTR described it:

> We are pleased to confirm that the United States has reached agreement in the GATS Article XXI process with Canada, the EU and Japan. The agreement involves commitments to maintain our liberalized markets for warehousing services, technical testing services, research and development services and postal services relating to outbound international letters. These commitments meet our WTO obligation under GATS Article XXI to make a compensatory adjustment in our WTO services commitments.

*Id.*; *see* http://www.ustr.gov/Document_Library/Press_Releases/2007/December/ Section_Index.html (Dec. 17, 2007 press release); *see also* USTR Press Release (Dec. 21, 2007) (also discussing the compensation agreement, available from the same web page). This compensation settlement agreement between the United States and the EU is the subject of plaintiff's FOIA request and this lawsuit.

As the Bottari Declaration explains, without seeing the actual language of the compensation agreement, it is difficult to gauge the potential impact of the new service commitments USTR announced would be added to the U.S. schedule of commitments under GATS. Each area would need to be assessed for the federal, state, and local laws that might be considered to violate GATS constraints or obligations and thus be subject to challenge once the new U.S. service sectors are brought under WTO jurisdiction. Bottari Decl. ¶ 17. However, some concerns immediately come to mind. For instance, as Bottari explains, under the United Nations services classification system used in the WTO GATS negotiations, the category "warehousing and storage services" includes the subcategory of "storage of liquids and gases," which includes natural gases, gasoline, oil, and chemicals. A GATS commitment of a service sector that includes the storage of such liquids and gases would not only be new for the United States, but a commitment in a highly sensitive area. Not only are hazardous "tank farms" for gas, oil and chemicals potentially covered by this commitment, but controversial offshore liquid natural gas ("LNG") terminals may also be covered. The siting of LNG terminals can be controversial due to the risk of presenting a target for terrorism and the significant dangers inherent in operation of an LNG facility. A ban on the establishment of an LNG facility near a major population center or other sensitive locations could be treated as a "zero quota" and thus a

12

WTO GATS violation under the reasoning of the Appellate Body in the Antigua cross-border gambling dispute. *Id.* ¶ 18. Other types of safety or environmental protections applied by federal or state governments could also be considered WTO violations. The environmental and safety laws governing common storage and warehouse facilities such as chemical tank farms are largely state and local. If these policies limit the location, size, and number of tanks, they also could run afoul of GATS market access rules. *Id.* The second press release by USTR on December 21, 2007 refers to the new U.S. commitment relating to "warehousing services" with the qualification "(excluding services supplied at ports and airports)," but it is unclear, without seeing the text of the compensation agreement, what hazardous warehouse and storage facilities would be excluded from GATS WTO jurisdiction.

Also of concern is whether public funds relating to "research and development" services might be affected by WTO rules requiring that they be shared on a "national treatment," or nondiscriminatory basis. *Id.* ¶ 19. According to USTR's December 17, 2007 press statement, the United States proposes to subject the "research and development services" ("R&D") category to WTO requirements. The agency's second press statement, on December 21, 2007, refers to "private research and development services." *Id.* Again, without seeing the text of the compensation agreement and without further information about what is meant by "private" R&D, it is difficult to gauge the concession's potential impact. However, R&D services would be a new commitment for the United States in a sector worth billions in federal and state taxpayer dollars. *Id.* In 1994, the United States carefully carved out R&D subsidies from its initial WTO GATS commitments. That meant that R&D dollars were exempt across the board, under each committed service category. *Id.* A new commitment regarding R&D services, a potentially

major policy change achieved without public input, would have to be examined carefully to determine how and whether state and federal taxpayer dollars are safeguarded. *Id.*

      **3.**      **Plaintiff's FOIA Request and USTR's Refusal to Disclose.** On December 19, 2007, after learning that a USTR spokesperson had announced the compensation settlement between the United States and the EU, plaintiff submitted a FOIA request to USTR seeking "the full text of the settlement between USTR and the European Union regarding America's online gambling laws." Brayton Decl. ¶ 2; Bliss Decl., Exh. 1. USTR denied both plaintiff's FOIA request and his administrative appeal, claiming that the document was being withheld in full pursuant to FOIA Exemption 1, 5 U.S.C. § 552(b)(1). Brayton Decl. ¶¶ 3, 5 & Exhs. A & C. According to Bliss's declaration, her staff identified the U.S. - EU joint letter and report as responsive to Brayton's FOIA request. Bliss Decl. ¶ 4. Exercising her original classification authority, Bliss classified the document as "Confidential" on the ground that it constituted "foreign government information" whose disclosure reasonably could be expected to result in damage to the national security, under the terms of the governing Executive Order. *Id.* ¶¶ 3, 7-8.

      As discussed below, USTR's decision to classify the compensation settlement agreement that the agency itself has already publicly announced and to which the United States is a party is not lawful under the Executive Order. Accordingly, the Court should order USTR to release it under FOIA.

14

**ARGUMENT**

**FOIA EXEMPTION 1 DOES NOT AUTHORIZE WITHHOLDING THE U.S. - EU COMPENSATION SETTLEMENT AGREEMENT.**

FOIA was enacted by Congress to prevent federal agencies from adopting secret law.  As the Supreme Court has emphasized, FOIA was designed "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny," *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted), while "balanc[ing] the public's need for access to official information with the Government's need for confidentiality."  *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 144 (1981).  To that end, the limited exemptions set forth in FOIA, 5 U.S.C. § 552(b), "are explicitly made exclusive, and must be narrowly construed." *Rose*, 425 U.S. at 361 (citations omitted); *accord Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001); *Ctr. for Int'l Envtl. Law v. USTR*, 505 F. Supp. 2d 150, 155 (D.D.C. 2007) ("*CIEL*") (FOIA exemptions are "to be construed as narrowly as possible to provide the maximum access to agency information based on the overall purpose of the Act"). The statute's "strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents."  *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991); *accord Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998).

Summary judgment in a FOIA case, like in any other, is "in order where, viewing the record in the light most favorable to the non-moving party, the court finds that there remains no 'genuine issue as to any material fact.'"  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (quoting Fed. R. Civ. P. 56(c)).  Because the burden is on the agency to show that requested material falls within a FOIA exemption, "[w]hen an agency seeks

15

to protect material which, even on the agency's version of the facts, falls outside the proffered exemption, summary judgment in favor of the FOIA plaintiff is appropriate." *Id.* "FOIA compels disclosure in every case where the government does not carry its burden of convincing the court that one of the statutory exemptions apply." *Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 76 (D.C. Cir. 1987). This includes Exemption 1 cases, in which the district court must conduct de novo review of the classification decision, with the burden on the agency claiming the exemption. *Id.* at 77; *see* 5 U.S.C. § 552(a)(4)(B) (requiring de novo review). Indeed, Congress amended FOIA in 1974 for the express purpose of "clarifying its intent that courts act as an independent check on challenged classifications decisions." *Goldberg*, 818 F.2d at 76. Conclusory, vague, or sweeping affidavits from the agency cannot support summary judgment in its favor. *King v. U.S. Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987).

Exemption 1 exempts from disclosure any documents that are "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552(b)(1); *see also King*, 830 F.2d at 214; *Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 481 (D.C. Cir. 1980). EO 13292, 68 Fed. Reg. 15315 (2003), is the governing Executive Order. That order specifies the following conditions for classifying information, all of which must be met:

(1)     an original classification authority is classifying the information;

(2)     the information is owned by, produced by or for, or is under the control of the United States Government;

(3)     the information falls within one or more of the categories of information listed in section 1.4 of this order; and

16

(4)     the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

EO 13292 § 1.1(a); *see also id.* § 1.2(a)(3) (defining the "Confidential" classification level). As discussed in Sections A and B below, neither the third nor the fourth substantive requirement for classifying information is satisfied here. And, as discussed in Section C, even if these requirements were satisfied, USTR has failed to carry its burden of demonstrating that no portion of the agreement may be segregated and disclosed.

## A.     The Compensation Settlement Agreement Does Not Constitute "Foreign Government Information" Under § 1.4(b) of the Executive Order.

Information may be classified only if it falls within one or more of the categories of information listed in section 1.4 of the Executive Order. "Foreign government information" is designated as one such category in section 1.4(b). The Executive Order defines "foreign government information" in relevant part as follows:

> information produced by the United States Government pursuant to or as a result of a joint arrangement with a foreign government or governments, or an international organization of governments, or any element thereof, *requiring* that the information, the arrangement, or both, are to be held in confidence.

EO 13292 § 6.1(r)(2) (emphasis added). USTR relies on the Bliss Declaration to argue that the U.S. - EU compensation settlement agreement qualifies as foreign government information subject to classification under section 1.4(b) because the procedures governing the modification of a member's schedule of commitments under GATS "require" that such agreements be treated as "secret." Bliss Decl. ¶¶ 7, 13; *see also* Def. Mem. at 1, 2, 8. However, the agency's determination that the United States was "required" by WTO rules to keep its compensation

17

settlement agreement secret, and hence, that the settlement constitutes foreign government information, is based on a declaration that is both conclusory regarding the alleged requirement of secrecy and incorrect.

      **1.**      USTR's contention that the United States was required to keep the agreement secret rests entirely on paragraph 5 of the procedures governing GATS Article XXI modification of commitments, set out in WTO Document S/L/80, Procedures for the Implementation of Article XXI of the General Agreement on Trade in Services (GATS). Bliss Decl. ¶¶ 6-7, 13 & Exh. 2 (Document S/L/80); *see also* Def. Mem. at 1-2, 8. The Bliss Declaration quotes from paragraph 5 and then asserts that the joint letter and report containing the compensation settlement agreement were properly classified as foreign government information "consistent with their status as WTO 'secret' documents under paragraph 5." Bliss Decl. ¶ 7.

      That assertion by USTR is unfounded. The procedures set out in Document S/L/80 do not require a WTO member to keep its compensation agreements secret. Indeed, the procedures require only the WTO Secretariat itself to maintain confidentiality when it circulates the modifying member's documents to other WTO signatory nations; they impose no secrecy requirement on the modifying member nation (here, the United States) itself or on any other WTO member nations. Paragraph 5 of the procedures provides:

> Upon completion of each negotiation conducted under paragraph 2(a) of Article XXI, the modifying Member shall send to the Secretariat a joint letter signed by the Members concerned, together with a report concerning the results of the negotiations which shall be initialled by the Members concerned. *The Secretariat will distribute the letter and the report to all Members in a secret document.*

Document S/L/80, ¶ 5 (emphasis added). Similarly, paragraph 1 of the procedures requires the Secretariat to distribute "in a secret document" to all other members the modifying member's

official notification that it intends to modify or withdraw a scheduled commitment, such as the

United States's May 4, 2007 notification.  It is this notification that triggers the compensation

negotiations.  Likewise, paragraph 6 requires the same distribution procedure for the modifying

member's final report after it has reached agreement with all members that have filed claims.

Document S/L/80.

In all three instances, the procedures speak only in terms of the *Secretariat's* role in

distributing the modifying member's notification, letters, and reports of compensation

agreements to other WTO members.  The procedures say *nothing* about whether the United

States as the modifying member (or any other WTO member, for that matter) may disclose to the

public the service sector commitments it is agreeing to make in its compensation

agreements—commitments that have the potential for serious regulatory consequences, as

explained above.  In other words, Document S/L/80 governs the Secretariat's actions in

circulating these documents to other WTO members but does not "require" the United States or

other WTO members to keep the documents confidential.

The procedures in S/L/80 requiring distribution of the notification, letters, and reports by

the *Secretariat* in a secret document are consistent with the Secretariat's role within the WTO as

an administrative body bound to act neutrally and with the utmost diplomatic discretion, rather

than a reflection of the rights and obligations of the WTO members themselves.  The general role

of the Secretariat is set out in Article VI of the Agreement Establishing the World Trade

Organization, *available at* http://www.wto.org/english/docs_e/legal_e/04-wto.pdf.  Article VI

emphasizes the neutrality and discretion to be exercised by the Director-General, who heads the

Secretariat, and by the Secretariat's staff :

> The responsibilities of the Director-General and of the staff of the Secretariat shall be exclusively international in character.  In the discharge of their duties, the Director-General and the staff of the Secretariat shall not seek or accept instructions from any government or any other authority external to the WTO.  They shall refrain from any action which might adversely reflect on their position as international officials.  The Members of the WTO shall respect the international character of the responsibilities of the Director-General and of the staff of the Secretariat and shall not seek to influence them in the discharge of their duties.

Agreement Establishing the WTO, Art. VI.4.  Article VI.2 authorizes the adoption of regulations setting out the "powers, duties and conditions of service" of the Secretariat and its staff.  Those staff regulations, set out in Document WT/L/282, *Conditions of Service Applicable to the Staff of the WTO Secretariat* (1998), emphasize the obligations of the Secretariat staff to exercise "the utmost discretion" and to refrain from "communicat[ing] to any person any information known to them by reason of their official position which has not been made public, except where so authorized by the Director-General," Regulation 1.7, at 6; to "maintain their independence," Regulation 1.4, at 5-6 & Annex B, Standards of Conduct ¶ 20, at 18; and to "avoid any action which would, by impairing good relations with a government, criticising its actions or undermining or discrediting its authority, reflect adversely on the WTO . . . ."  Annex B, Standards of Conduct ¶ 22, at 18.  The Standards of Conduct emphasize that "the WTO is composed of its Members, and the Secretariat is there to provide services to the WTO, not to determine its policies."  Annex B, Standards of Conduct ¶ 25, at 19.[3]

---

[3]  The staff regulations and standards of conduct in Document WT/L/282 are available at http://docsonline.wto.org/DDFDocuments/t/WT/L/282.DOC.  WTO Documents with known document numbers may be retrieved from the WTO documents search web page, http://docsonline.wto.org, by selecting "simple search" and then entering the document number (*e.g.*, WT/L/282 or S/L/80) in the box next to "Document symbol."

Numerous documents on the WTO website reiterate that decisions are to be made by WTO members, not by the Secretariat.  *See*, *e.g.*, The World Trade Organization at 7 (Secretariat) ("Since decisions are taken by the members themselves, the Secretariat does not have the decision-making role that other international bureaucracies are given."), *available at* http://www.wto.org/english/res_e/doload_e/inbr_e.pdf; WTO: Secretariat and Budget: Overview of the WTO Secretariat ("Since decisions are taken by Members only, the Secretariat has no decision-making powers."), *available at* http://www.wto.org/english/thewto_e/ secre_e/intro_e.htm.  The Secretariat plays a support role in administering GATS:

> The WTO Secretariat assists Members in the development, administration and application of the various Agreements.  This entails a variety of supporting functions for relevant WTO bodies . . . , the provision of technical assistance and advice to developing countries and countries in accession, the analyses of trade and trade policy developments in individual economies and overall, and the contribution of legal information and advice in dispute cases.

How the GATS is Administered: 4.3 Role of the WTO Secretariat, *available at* http://www.wto.org/english/tratop_e/serv_e/cbt_course_e/c4s3p1_e.htm.

Given that the Secretariat is expected to exercise discretion and neutrality and to leave policy decisions to the WTO members—in short, because "the secretariat is under direct and indirect pressure to maintain a non-assertive profile," Gregory Shaffer, *The Role of the WTO Director-General and Secretariat*, 4 World Trade Review 429 (2005), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=930493, at 1—it is neither surprising nor illuminating that the GATS Article XXI procedures cited by USTR impose on the Secretariat an obligation to notify other WTO members of developments in Article XXI compensation negotiations in a secret document.  In other words, the fact that neither the Secretariat nor the

WTO has taken it upon *itself* to make the compensation agreements public as they are agreed to by WTO members does not mean that *WTO members themselves* are prohibited from disclosing the agreements to the public in accordance with their domestic public disclosure laws, such as FOIA. Secrecy may suit some WTO members that lack a tradition of transparency, but the agencies of the United States are subject to FOIA, an open government law, and nothing in Document S/L/80 requires that the United States keep the compensation agreement secret. *See Public Citizen v. USTR*, 804 F. Supp. 385, 388 (D.D.C. 1992) (requiring USTR to publicly disclose panel decisions under the General Agreement on Tariffs and Trade ("GATT") and USTR's submissions to GATT panels, noting that "GATT procedural rules favor confidentiality of these materials, but do not require it" and that FOIA, in any event, prevails); *cf. Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (to qualify as a withholding statute under Exemption 3, "a statute 'must *on its face* exempt matters from disclosure'") (citation omitted) (emphasis in original).

    **2.**    Indeed, USTR's position that the GATS Article XXI procedures set out in Document S/L/80 *require* secrecy is self-contradictory and proves far too much. USTR's view of the requirements of the procedures expressed here is at odds with its own public disclosures in this matter to date, thereby undermining the agency's construction of the procedures in this case. For starters, in its May 4, 2007 press release, USTR publicly announced that it had officially notified the WTO that it intended to invoke GATS Article XXI procedures to clarify that its commitment involving "recreational services" excludes gambling and betting services. USTR exercised its right as a WTO member to make such a public disclosure of its notification notwithstanding the fact that paragraph 1 of Document S/L/80 states that the *Secretariat* will

distribute that notification to other members in a "secret document." Bliss Decl., Exh. 2.
Additionally, USTR already has disclosed some of the content of the U.S. - EU compensation
agreement. In both its December 17 and December 21, 2007 press releases, USTR not only
announced the *fact* of the compensation agreement, but stated that the agreement involved U.S.
commitments relating to warehousing services, technical testing services, research and
development services, and postal services relating to outbound international letters, *see supra*
pages 11-13—even though paragraph 5 of Document S/L/80 requires the *Secretariat* to circulate
the compensation agreement in a "secret document." Given that USTR's actions demonstrate
that the GATS Article XXI procedures do not prohibit the United States from announcing the
*substance* of the compensation agreement, there is no basis for the agency's argument that the
same procedures bar the United States from disclosing the *text* of the agreement.

Furthermore, in response to plaintiff's administrative FOIA appeal, USTR wrote that
once the negotiating process is complete, the adjustments to the United States schedule of
commitments will become public. Brayton Decl. ¶ 5 & Exh. C. But Document S/L/80 does not
draw a distinction between public disclosures made after *some* compensation agreements are
reached versus public disclosures made after *all* compensation agreements are reached. There is
no need for the procedures to make that distinction because the procedures do not in fact prohibit
*any* such disclosures by the WTO members.

**3.**     Finally, to interpret the GATS Article XXI procedures to bar modifying countries
from making their compensation agreements public would create an unnecessary contradiction
between a WTO member's uncontested right to disclose its own submissions to WTO tribunals
when a dispute is before a dispute resolution body and its right to disclose a compensation

agreement that it has consummated with another country.  And USTR's construction also is unnecessarily at odds with the United States's own policy that its submissions to WTO dispute tribunals be made public.

Under the rules that govern disputes (such as the Antigua cross-border gambling case) brought pursuant to the consultation and dispute settlement provisions of various WTO agreements, WTO members are specifically authorized to disclose statements of their own positions to the public.  These rules are known as the Understanding on Rules and Procedures Governing the Settlement of Disputes, or the "DSU."  *See* DSU Art. 1 & Appx. 1 (coverage and inclusion of GATS).[4]  The rules govern arbitration, which is identified in DSU Article 25 as "an alternative means of dispute resolution."  Unlike Document S/L/80, the DSU contains certain restrictions relating to confidentiality that are directed specifically to *the WTO members themselves*.  Even so, the DSU expressly distinguishes between a member's right to disclose others' submissions and its right to make public its own.  Although the default rule is that written submissions to a dispute resolution body "shall be treated as confidential," DSU Art. 18, and the DSU dictates that "[m]embers shall treat as confidential information submitted by another Member to the panel or the Appellate Body which that Member has designated as confidential," *id.*, the DSU explicitly authorizes a member that is party to a dispute to disclose its own submissions to the public:  *"Nothing in this Understanding shall preclude a party to a dispute from disclosing statements of its own positions to the public."  Id.* (emphasis added).

Consistent with that authorization, USTR's website and Reading Room include the U.S. submissions to WTO dispute resolution panels, arbitrators, and the appellate body not only in the

---

[4]  The DSU is available at http://www.wto.org/english/docs_e/legal_e/28-dsu.pdf.

Antigua gambling dispute, but for *all* WTO disputes, pending and concluded, to which the

United States is a party.  As USTR has affirmed, the agency makes its written submissions to

WTO dispute resolution bodies as soon as they are submitted.  65 Fed. Reg. 36501, 36502

(2000).[5]  Thus, during the gambling dispute with Antigua, the public had immediate access to the

United States's positions taken on the scope of its schedule of commitments and its obligations

under GATS as soon as those positions were conveyed to the WTO panels, arbitrators, and

appellate body—even though the dispute was still ongoing.

Of course, negotiations regarding compensation for withdrawing or modifying a

commitment under GATS Article XXI may not be successful.  Under GATS Article XXI and its

procedures, if a modifying member does not reach agreement regarding compensation with

interested countries, the affected member(s) may request arbitration.  GATS Art. XXI.3;

Document S/L/80, ¶ 7 (Bliss Decl., Exh. 2).  Such an arbitration would fall under the rules of the

DSU.[6]  Thus, if the United States had failed to reach a compensation agreement with, say, the

_____

[5]  *See* http://www.ustr.gov/Trade_Agreements/Monitoring_Enforcement/
Dispute_Settlement/WTO/Section_Index.html.  The U.S. policy of immediate public disclosure
of its submissions to international trade dispute resolution bodies is consistent with, and probably
an outgrowth of, this Court's decision in *Public Citizen*, 804 F. Supp. 385; *see also* 19 U.S.C.
§ 3537.  As discussed in Section B below, that the U.S. has long had a policy of disclosing its
own submissions and other types of "offers" in the international trade context also undermines its
claim that the disclosure of the compensation agreement here reasonably could be expected to
cause damage to U.S. national security.

[6]  According to its coverage provision, the DSU broadly applies "to disputes brought
pursuant to the consultation and dispute settlement provisions" of the covered agreements, which
includes GATS.  *See* DSU Art. 1.1 & Appx. 1.  DSU Article 1.2 states that "[t]o the extent that
there is a difference between the rules and procedures of this Understanding and the special or
additional rules and procedures set forth in Appendix 2, the special or additional rules and
procedures in Appendix 2 shall prevail."  But DSU Appendix 2 lists only two provisions under
GATS that have adopted such "special or additional rules and procedures"—neither of which is
GATS Article XXI.  That arbitration under GATS Article XXI is subject to the DSU is also

EU, and the EU had invoked its right to arbitration, the United States could (and presumably

would) have made available to the public its position that *the very modifications* to its schedule

of commitments that are now at issue were appropriate under GATS Article XXI.  Under the

GATS Article XXI procedures, the arbitration body would be tasked:

> To examine the compensatory adjustments offered by (name of modifying
> Member) or requested by (affected Member requesting the arbitration) and to find
> a resulting balance of rights and obligations which maintains a general level of
> mutually advantageous commitments not less favourable to trade than that
> provided for in Schedules of specific commitments prior to the negotiations.  In
> such examination, the Arbitration body shall take into account any agreement
> reached, in negotiations under paragraph 4, above, between the modifying
> Member and any affected Member.

Document S/L/80, ¶ 13.  Thus, if the U.S. and EU had gone to arbitration, the GATS Article XXI

procedures would not even arguably have prohibited the United States from disclosing its

arbitration submissions discussing any compensation agreements it had achieved and the specific

proposals it had made to the EU.  It makes no sense to read Document S/L/80 in an anomalous

way to bar the United States from disclosing the text of a *consummated* compensation agreement

with a WTO member here while permitting the United States to disclose compensation

agreements and U.S. nonfinal negotiating positions in the situation where negotiations were

unsuccessful and the United States has been forced to arbitrate.  To withhold an achieved

---

indicated by the express reference in the GATS Article XXI procedures to the "Rules of conduct
for the understanding on rules and procedures governing the settlement of disputes."  Document
S/L/80, ¶ 11.  These "Rules of Conduct," *available at* http://www.wto.org/english/tratop_e/
dispu_e/rc_e.htm, are the procedural rules that apply to the dispute resolution tribunals that are
deciding disputes subject to the DSU.  The Rules of Conduct likewise explicitly state that they
apply to arbitrators proceeding under GATS Article XXI.3.  *See* Rules of Conduct, Part IV.1
(Scope) & Annex 1a.

agreement is contrary to the congressional aversion, embodied in FOIA, to the creation of "secret

(agency) law." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (citation omitted).

For all these reasons, USTR's assertion that Document S/L/80 "requires" that the United

States keep its compensation agreement with the EU secret is conclusory, unsupported, and

ultimately wrong.  The compensation agreement does not qualify as foreign government

information under the terms of the Executive Order, and, therefore, it must be released.

**B.** **The Release of the Compensation Settlement Agreement Cannot Reasonably Be Expected to Result in Damage to the National Security.**

Even if this Court determines that the compensation settlement agreement embodied in

the joint letter and report falls within classification category 1.4(b) for foreign government

information, USTR nonetheless has failed to establish that disclosure of this document

"reasonably could be expected to result in damage to the national security," the final requirement

for classification specified in section 1.1(a)(4) of EO 13292.

**1.** USTR contends that because the Executive Order "presumes" damage to the

national security from the unauthorized disclosure of foreign government information, the

Court's inquiry is at an end.  Def. Mem. at 8 (citing EO 13292 § 1.1(c)).  USTR nevertheless

attempts to go beyond the presumption and argue that the disclosure of the compensation

agreement reasonably could be expected to result in damage to the national security because

"unilateral public release" by the United States of information contained in a WTO "secret"

document would damage the trust that other WTO members place in the United States to protect

trade "negotiating documents" that are exchanged with "the expectation that they will be kept

confidential."  That, in turn, would "undermine the ability of the United States to negotiate and

conclude trade and investment agreements on terms favorable to U.S. economic and security interests." *Id.* at 9 (quoting Bliss Decl. ¶¶ 11-12).

USTR's argument is flawed on several grounds. First, the statement in the Executive Order that unauthorized disclosure of foreign government information is "presumed" to cause damage to the national security, EO 13292 § 1.1(c), does not end the inquiry, as is made clear by several D.C. Circuit decisions considering Exemption 1 claims under previous Executive Orders containing the same presumption. As the court of appeals explained in interpreting the meaning of the presumption of damage from disclosure of foreign government information in Executive Order 12065, 43 Fed. Reg. 28949 (1978), issued by President Carter:

> [W]e agree that the fact that certain information has been received from a foreign government "in confidence" does not, by itself, compel automatic classification of the document. Section 1-302 makes clear that, even for foreign government documents, a classification decision requires an additional determination by the original classification authority that unauthorized disclosure reasonably could be expected to cause "at least identifiable damage" to the national security.

*Carlisle Tire & Rubber Co. v. U.S. Customs Serv.*, 663 F.2d 210, 217 (D.C. Cir. 1980); *cf. U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171-81 (1993) (rejecting presumption that all sources supplying information to FBI in course of a criminal investigation are confidential sources under Exemption 7(D)). Executive Order 12356, 47 Fed. Reg. 14874 (1982), issued by President Reagan, likewise included this presumption of damage, and yet the D.C. Circuit emphasized that the district court "was not obliged to accept [the government's] affidavit without question" regarding its discussion of damage to the national security. *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984); *see also Steinberg v. U.S. Dep't of Justice*, 179 F.R.D. 357, 362 (D.D.C. 1998) (government *Vaughn* index not sufficiently specific regarding claimed confidentiality agreements

with foreign countries, notwithstanding presumption of damage expressed in Executive Order).

The D.C. Circuit's decision in *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998),

rejecting an FBI declaration in support of Exemption 1, and this Court's decision on remand,

*Campbell v. U.S. Dep't of Justice*, 193 F. Supp. 2d 29 (D.D.C. 2001), continuing to deny the

agency summary judgment on Exemption 1 grounds, also involved the Reagan Executive Order

with its presumption of damage from the unauthorized disclosure of foreign government

information. *See Campbell*, 164 F.3d at 29 (holding that the Reagan Executive Order applied to

the FOIA request).

    **2.**    To be sure, agency declarations provided in Exemption 1 cases merit "substantial

weight," as USTR observes, Def. Mem. at 7, 9 (citing *Morley v. CIA*, 508 F.3d 1108, 1124 (D.C.

Cir. 2007)), but "deference is not equivalent to acquiescence." *Campbell*, 164 F.3d at 30; *see

also Coldiron v. U.S. Dep't of Justice*, 310 F. Supp. 2d 44, 53 (D.D.C. 2004) ("[E]ven in

Exemption 1 situations, the court is not to be a wet blanket.  No matter how much a court defers

to an agency, its "review is not 'vacuous'") (internal quotation marks omitted).  In this case,

USTR's declaration contending that disclosure of the compensation agreement "reasonably could

be expected to result in damage to the national security" is insufficient to support withholding the

U.S. - EU compensation agreement under Exemption 1.

    To begin with, it is important to bear in mind that USTR has not said that it classified the

compensation settlement agreement because the document contained sensitive information.

Instead, the agency's classification decision was categorical, based on the kind of document at

issue regardless of its content.  But content is an important consideration in evaluating damage to

the national security.  According to the Executive Order:

> "Damage to the national security" means harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, *taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information.*

EO 13292 § 6.1(j) (emphasis added). In other words, an agency cannot classify a document without taking into account the actual content of that document and the likely consequences of its release. *See, e.g.*, *Campbell*, 164 F.3d at 31 (faulting FBI declaration for failing to connect general statements about the content of withheld documents with general standards for classifying information). Here, USTR makes no argument that the content of the agreement is sensitive, apart from its categorical claim that all such documents must be kept secret under the GATS Article XXI procedures. Yet "[a]n affidavit that contains merely a 'categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate.'" *Id.* at 30 (quoting *PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 250 (D.C. Cir. 1993)); *King*, 830 F.2d at 219 (affidavits cannot support summary judgment if they are "too vague or sweeping").

The U.S. - EU compensation settlement agreement concerns U.S. commitments under GATS regarding the market access it will afford foreign firms in particular service sectors. It apparently contains nothing "sensitive," "valuable," or "useful," EO 13292 § 6.1(j), with respect to U.S. national security interests. Furthermore, with respect to "provenance," the agreement was signed by the United States and reflects legal commitments made by the United States. Thus, there is no "logical connection between the information and the claimed exemption." *Salisbury v. United States*, 690 F.2d 966, 970 (D.C. Cir. 1982); *see also Lesar*, 636 F.2d at 481, and, accordingly, no basis for classifying the document.

Both *Morley* and *Miller v. DOJ*, --- F. Supp. 2d ---, 2008 WL 2544659 (D.D.C. June 24, 2008), cited by USTR (at 7, 9), are distinguishable for this very reason. In *Morley*, the D.C. Circuit sustained the CIA's invocation of Exemption 1 in response to a FOIA request seeking documents pertaining to a deceased CIA officer only after considering the CIA's "more thorough" discussion in its declaration of the national security implications under its Exemption 3 analysis. 508 F.3d at 1124. The declaration gave the court "substantial insight into the CIA's reasons for protecting intelligence sources and methods" and drew "causal connections between the release of certain kinds of information and the danger to national security that would result, satisfying the CIA's obligation to identify the 'particularized harm that could be expected to occur from production of the requested information.'" *Id.* at 1125. The actual content of the documents concerned intelligence sources and methods and thus was sensitive.

The same was true of *Miller*, in which this Court upheld the State Department's determination of damage if documents constituting foreign government information were disclosed. The State Department had withheld in full or in part a series of telegrams that recounted exchanges between Embassy officials and high-level St. Kitts government officials containing sensitive discussions regarding an extradition case, possible corruption, and drug traffickers' influence in St. Kitts, detailed analysis of threats to the physical safety of Americans in St. Kitts, the U.S. government's planned response, candid assessments of top St. Kitts officials, and other information obtained from foreign governments—disclosure of which would anger government officials and cause damage to the U.S. relationship with St. Kitts. 2008 WL 2544659, at *6-*7. Thus, release of the information reasonably could be expected to result in

31

damage to the national security.  *Id.* at *7.  As the Court found, the "contents of these telegrams" included "confidential sources and sensitive aspects of U.S. foreign relations."  *Id.* at *8.

      USTR's claim of damage in this case—where the contents of the document are not sensitive, do not include information from confidential sources or candid exchanges with foreign governments, do not reveal intelligence sources and methods, and have no bearing on national defense issues—strays far from the kinds of cases in which courts have upheld the invocation of Exemption 1 as justification for withholding a document sought under FOIA.  *Compare, e.g.*, *Krikorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993) (information about foreign governments containing frank internal discussions of foreign relations matters that was communicated to U.S. government by foreign governments on a confidential basis properly classified under Exemption 1); *Baez v. U.S. Dep't of Justice*, 647 F.2d 1328, 1335-36 (D.C. Cir. 1980) (materials provided by foreign intelligence agencies that requested secrecy properly classified where information would disclose intelligence sources or methods or would reveal FBI's relationship with foreign intelligence agency); *Southam News v. INS*, 674 F. Supp. 881, 884-85 (D.D.C. 1987) (two letters from foreign government officials to U.S. officials given in confidence and implicating national security interests properly withheld under Exemption 1).

      **3.**    Rather than point to sensitive information within the compensation agreement, USTR relies on a more categorical assertion that the agreement is a type of document that must be kept secret under the GATS Article XXI procedures, and hence, its release would harm U.S. national security.  The agency reasons that disclosure of the document "reasonably could be expected to result in damage to the national security" because it would damage the trust that other WTO members have in the United States "to protect trade negotiating documents that are

32

exchanged with the expectation that they will be kept confidential."  USTR's justification for withholding the document should be rejected because it assumes facts that are incorrect or have not been established and because it is conclusory and farfetched—especially given U.S. policy of making public its own submissions to WTO dispute resolution tribunals and other international tribunals, as well as disclosing other U.S. trade negotiating stances.

First, in several places, the Bliss Declaration refers to plaintiff's FOIA request as seeking "negotiating documents."  *See* Bliss Decl. ¶¶ 11-12.  Similarly, it asserts that foreign governments will be less willing to engage in trade negotiations with the United States if the United States "unilaterally disclose[s] to the public information exchanged in confidence in the course of negotiations."  *Id.* ¶ 12.  But plaintiff's FOIA request sought neither "negotiating documents" nor "information exchanged in confidence in the course of the negotiations."  Instead plaintiff asked for the *final product* of the negotiations, the compensation settlement agreement itself, *see* Brayton Decl. ¶ 2 & Bliss Decl., Exh. 1—a consummated agreement between the United States and the EU that USTR *itself* publicly proclaimed in its December 17, 2007 press release.  *See* USTR December 17, 2007 press release ("We are pleased to confirm that the United States has reached agreement in the GATS Article XXI process with Canada, the EU and Japan."), *available at* http://www.ustr.gov/Document_Library/Press_Releases/2007/December/ Section_Index.html.  USTR does not explain why the concerns about other countries' willingness to negotiate in good faith with the United States that might accompany release of information about the United States's or EU's bargaining positions in ongoing negotiations apply to the revelation of the *text* of an agreement between these two members that has already been reached and publicly announced.  Analogously, the Supreme Court has observed in the Exemption 5

33

context that it is difficult to see how the government's interest keeping predecisional communications confidential applies "after the decision is finally reached," *Sears*, 421 U.S. at 151, especially given the "increased public interest in knowing the basis for agency policy already adopted." *Id.* at 152; *see also Public Citizen*, 804 F. Supp. at 387 (ruling that U.S. submissions to GATT panels constituted "statements of policy and interpretations" subject to disclosure under 5 U.S.C. § 552(a)(2)(B)).[7]

Second, the Bliss Declaration refers to damage to the trust other WTO members place in the United States to protect trade negotiating documents "that are exchanged with the expectation that they will be kept confidential." Bliss Decl. ¶ 11; *see also id.* ¶ 12 ("information exchanged in confidence"). The implicit assertion here—that the compensation settlement agreement is a document that was "exchanged with the expectation" that it would "be kept confidential"—is unsupported. The only basis for USTR's claim of confidentiality is Document S/L/80, in which the obligation of confidentiality is imposed only on the WTO Secretariat. Even if the Court accepts that the compensation agreement qualifies as "foreign government information," USTR has not established any expectations on the part of the EU or other WTO members that the *United States* would keep its own compensation agreements confidential. Indeed, under the GATS Article XXI procedures, all *other* WTO members have received the U.S. - EU compensation agreement as set out in the joint letter and report that was circulated by the Secretariat pursuant to paragraph 5 of Document S/L/80, and USTR itself has said that the

---

[7] To the extent that the joint letter and report contain "information exchanged in confidence in the course of the negotiations," apart from the compensation agreement itself, then such material could conceivably be redacted and the remainder released—assuming that the material qualifies as foreign government information in the first place (which plaintiff contests) and that USTR justifies any redaction. *See infra* Section C.

negotiated changes in the U.S. schedule of commitments will ultimately become public.  Brayton

Decl. ¶ 5 & Exh. C; Defendant's Answer ¶¶ 8, 9 (Docket No. 3).  These disclosures belie any

claim that WTO members would have a reasonable expectation that the U.S. would keep its

compensation agreement secret.  To justify withholding a document under Exemption 1, "the

government cannot rely on boilerplate or indiscriminate statements that information is held in

confidence."  *Steinberg*, 179 F.R.D. at 362; *cf. Lawyers Alliance for Nuclear Arms Control v.

Dep't of Energy*, 766 F. Supp. 318, 322-23 (E.D. Pa. 1991) (denying summary judgment to

agency on Exemption 1 claim that disclosure would breach confidentiality agreement with

foreign country when agency failed to establish foreign country's opposition to disclosure).

Thus, given that the premises of USTR's argument regarding damage to the national

security are either incorrect (FOIA request seeks "negotiating documents" or "information

exchanged . . . in the course of negotiations") or unsubstantiated (FOIA request seeks documents

"exchanged with the expectation that they will be kept confidential"), plaintiff should need go no

further to refute USTR's claim of damage to the national security.

Nonetheless, the Court should also reject USTR's conclusory and implausible

fundamental assertion: that disclosure by the United States of the compensation agreements it

reaches with other WTO members as these agreements are consummated (rather than wait until

its GATS schedule of commitments is finally modified and it is too late for public input)

reasonably can be expected to result in damage to the national security.

USTR's claim through the Bliss Declaration that other WTO members will not want to

negotiate trade and investment agreements on terms favorable to the United States, Def. Mem. at

9 (quoting Bliss Decl. ¶¶ 11-12), is wholly unsupported.  Such bald averments have repeatedly

been held insufficient to support the applicability of Exemption 1.  *See*, *e.g.*, *Campbell*, 164 F.3d at 30-31 (reversing and remanding because government declaration provided only sweeping conclusory claim of anticipated harm to national security); *King*, 830 F.2d at 223-25 (remanding because *Vaughn* index failed to explain how disclosure of material in question would cause the requisite degree of harm to the national security); *Peltier v. FBI*, 2005 WL 735964, at *10 (W.D.N.Y. Mar. 31, 2005) (holding too conclusory FBI declaration maintaining that disclosure of communication would "violate the FBI's promise of confidentiality" to foreign government component and "could reasonably be expected to strain relations between the United States and the foreign government, having a chilling effect on the free flow of vital information to the intelligence and law enforcement agencies, and cause serious damage to the national security of the United States and the war on transnational terrorism"); *Campbell*, 193 F. Supp. 2d at 37 (holding on remand that FBI's declaration was still too conclusory and failed to "adequately explain a nexus with national security concerns [as] required under Exemption 1").

The Court's recent decision in *CIEL*, 505 F. Supp. 2d 150, a similar FOIA case against USTR, is particularly on point, although the arguments for disclosure in this case are even stronger.  In *CIEL*, the plaintiff filed a FOIA request with USTR seeking documents relating to sessions of the Negotiating Group on Investment ("NGI") for the Free Trade Agreement of the Americas ("FTAA").  The NGI had been working on drafting an international agreement to establish a free trade area among approximately 34 participating nations in the western hemisphere.  *Id.* at 153.  Four documents withheld by USTR on Exemption 1 grounds were in dispute.  Each was shared with the NGI and explained the United States's proposed position on various issues.  *Id.* at 154.  As here, USTR argued that these documents "pertain[ed] to

negotiations that were expected to be maintained in confidence." *Id.* at 156.  (Unlike here, however, the documents in *CIEL* did not pertain to a consummated agreement.)  USTR's argument that disclosure would damage the national security was nearly identical to its argument here, though apparently was more detailed in the *CIEL* case.  *See id.* at 156-57.  USTR contended that releasing the information could reduce the chances of the United States's proposals being adopted.  *Id.* at 156.  It asserted that disclosure could harm the United States's relations with foreign governments and its "ability to obtain agreements that best serve its economic and diplomatic interests." *Id.* at 156-57.  USTR also submitted a declaration stating that under the FTAA operating rules, "negotiating countries 'are expected to maintain each other's proposals in confidence,'" and thus, disclosure could create confidentiality concerns for the United States's trading partners.  *Id.* at 157.

The Court held that USTR had not established the appropriateness of withholding the four documents under Exemption 1.  According to the Court, neither USTR declaration "demonstrate[d] a strong nexus between the release of the documents and harm to the United States foreign policy." *Id.*  The Court reasoned that USTR failed (as it has here) to show that the alleged "reduced negotiation flexibility" would cause the "requisite degree of harm" to the economic and security interests of the United States.  *Id.* (quoting *King*, 830 F.2d at 224).  As is also the case here, the USTR declaration in *CIEL* focusing on harm to the national security contained "sweeping conclusory statements of the harm USTR expects will result but fail[ed] to provide the basis of that conclusion." *Id.*  Finally, the Court observed that although USTR contended that FTAA operating rules prevent disclosure, USTR failed to show that disclosure by the United States of its own proposals would constitute a breach of the rules.  *Id.* at 157-58.

37

Similarly, consistent with U.S. federal courts' general disdain for "secret law," *PHE*, 983 F.2d at 252; *Providence Journal Co. v. U.S. Dep't of the Army,* 981 F.2d 552, 556 (1st Cir. 1992), the court in *Public Citizen*, 804 F. Supp. at 387-88, held in response to a FOIA request that USTR was required to release both its submissions to GATT dispute resolution panels and the panel decisions themselves— notwithstanding USTR's assertion that GATT rules forbade disclosure.

USTR's showing in support of its decision to classify and withhold the compensation agreement stands, if anything, on worse footing than what it offered in *CIEL*. It provides no factual underpinning for its broad claim that disclosure of a GATS Article XXI compensation agreement to which the United States is a party would harm national security. *See Wiener v. FBI*, 943 F.2d 972, 981 (9th Cir. 1991) (rejecting Exemption 1 justification for withholding that was based on "only a generalized, theoretical discussion of the possible harms which can result from the release of this category of information"). That broad claim is also contradicted by the United States's practice of making its own positions public in related trade dispute contexts and by releasing certain WTO negotiating documents. As discussed above, the WTO dispute resolution rules specifically authorize a member to make public its own positions advocated before WTO tribunals. *See* DSU Art. 18; *see also supra* pages 23-25. The United States not only makes its written submissions to WTO dispute resolution bodies available to the public as soon as they are submitted, 65 Fed. Reg. at 36502; *see also supra* note 5, but it also makes its filings before other international trade dispute resolution bodies public as well, such as its submissions to tribunals resolving disputes arising under the North American Free Trade Agreement ("NAFTA") Chapter

11, which established an investor-state dispute resolution system.[8]  These submissions, by

definition, involve the United States's positions in ongoing disputes, reflecting positions less

"final" than those that would be included in a consummated agreement with another WTO

member final enough for USTR to announce.

In addition, the United States has made public its "offers" on services in WTO trade

negotiations that are part of what is known as the "Doha Round" of negotiations (which recently

collapsed, Bottari Decl. ¶ 3).  *See* Initial U.S. Services Offer to the WTO (2003), *available at*

http://ustr.gov/Trade_Sectors/Services/2003_US_Services_Offer/Section_Index.html; Revised

U.S. Services Offer to the WTO (2005), *available at* http://ustr.gov/Trade_Sectors/Services/

2005_Revised_US_Services_Offer/Section_Index.html.  Such offers delineate nonfinal

bargaining positions that are much more likely to be thought "confidential" than an agreement

between WTO members that has already been announced.  *Cf. Sears*, 421 U.S. at 152-53 (noting

in Exemption 5 context that reasons supplied in final agency decision "constitute the 'working

law' of the agency").

USTR has not suggested that this U.S. policy of making public its submissions to

international trade dispute tribunals and statements of U.S. positions in trade negotiations has led

other nations to refuse to negotiate with the United States or resulted in other damage to the

national security.  Its contention here that, notwithstanding this general U.S. policy of disclosure,

release of the United States's own compensation settlement, which outlines an agreement by the

*United States* to make various trade concessions, will make other WTO members less "willing to

---

[8]  The United States's submissions in the NAFTA Chapter 11 disputes to which it is a
party are available on the State Department's website.  *See* http://www.state.gov/s/l/c3741.htm.

engage in the give-and-take of negotiations with the United States necessary to conclude trade and investment agreements," Bliss Decl. ¶ 12, is beyond implausible.  Common sense strongly suggests that other WTO members will not stop negotiating trade deals with the United States if the United States informs the public of trade *concessions* it has made in agreements with other WTO members.  *See Wiener*, 943 F.2d at 982 (rejecting justification for Exemption 1 withholding that was based on "seemingly farfetched harms" that seem to be without "relevance to the particular documents withheld").  Moreover, because under the GATS Article XXI procedures, all other WTO members have already received the U.S. - EU compensation agreement, set out in the joint letter and report circulated by the Secretariat, *see* Document S/L/80, ¶ 5, USTR cannot even argue that it is important to keep the agreement secret from other countries with which the United States is negotiating.  Given the disclosures of the compensation agreement that have already taken place and will take place, USTR's claim that the release of the compensation agreement under FOIA will upset WTO members' expectations of confidentiality and will harm U.S. national security interests is neither substantiated nor credible.

Because the U.S. - EU compensation settlement agreement does not constitute foreign government information and because, even if it did, its disclosure cannot reasonably be expected to result in damage to the national security, the Court should order USTR to release the joint letter and report in its entirety.  At the very least, as discussed in Section C, the Court should require USTR to release the specific commitments made by the United States in the agreement.

C.    **Even if the Compensation Agreement Were Properly Classified in Part, USTR Has Not Carried Its Burden of Establishing That No Portions of the Document May Be Segregated and Released.**

Finally, USTR argues that no part of the joint letter and report may be segregated and released. Def. Mem. at 10. It maintains that the GATS Article XXI procedures specified in paragraph 5 of WTO Document S/L/80 "call for agreements and reports negotiated under GATS Article XXI:2(c) to be treated as 'secret' in their entirety." *Id.* (quoting Bliss Decl. ¶ 13). Accordingly, USTR concluded that "there are no segregable portions of the joint letter and report that can be released." *Id.* Again, USTR's showing falls short.

Document S/L/80 says nothing about WTO *members* being required to treat "agreements and reports negotiated" under GATS XXI "as 'secret' in their entirety." *See* Bliss Decl. ¶ 13. USTR's decision to withhold the document in its entirety, however, underscores the fact that the compensation settlement agreement contains no sensitive information to redact, thus leaving the agency to treat the document as categorically exempt, despite FOIA's requirement that agencies undertake to release reasonably segregable portions of withheld documents. "FOIA specifically requires that, if a requested record contains information that is exempt from disclosure under one of the FOIA exemptions, '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.'" *Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1026-27 (D.C. Cir. 1999) (quoting 5 U.S.C. § 552(b)); *see also Krikorian*, 984 F.2d at 466 ("We have made clear that '[t]he "segregability" requirement applies to all documents and all exemptions in the FOIA.'") (citation omitted). In other words, because the actual content of the compensation settlement agreement furnishes no basis for classification, USTR has been forced to resort to the very

"exemption by document" approach that has been repeatedly condemned by the D.C. Circuit, even in the national security context. *See Ray v. Turner*, 587 F.2d 1187, 1197 (D.C. Cir. 1978).

It is important to remember that "[t]he focus in the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992) (quoting *Mead Data Central, Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)). Again, the fact that USTR disclosed *some* description of the compensation agreement in its public announcements suggests that at least *some* information about the agreement may properly be segregated and released even if the document were properly classified in part. For example, if the joint letter and report included a description of preliminary bargaining stances adopted by the EU that were not adopted in the ultimate agreement or confidential information provided by the EU (and we have no reason to believe that either is the case), then such portions of the document could potentially be redacted, so long as USTR justified the redaction. The remainder of the document, setting forth the actual agreement between the United States and the EU regarding the United States's modifications of its schedule of commitments, could then be released. USTR's "conclusory assertion" that the compensation settlement agreement is "exempt and nonsegrable is insufficient to support nondisclosure." *Campbell*, 164 F.3d at 31; *see also CIEL*, 505 F. Supp. 2d at 158 (ruling that even if Exemption 1 is found to justify withholding documents, USTR "may not automatically withhold the full document as categorically exempt without disclosing any segregable portions").

42

**CONCLUSION**

For the foregoing reasons, plaintiff requests that the Court grant his motion for summary judgment, deny USTR's motion for summary judgment, and order USTR to release the U.S. - EU compensation agreement contained in a joint letter and report submitted to the WTO.

Respectfully submitted,

  /s/ *Bonnie I. Robin-Vergeer*
Bonnie I. Robin-Vergeer
(D.C. Bar No. 429717)
Adina H. Rosenbaum
(D.C. Bar No. 490928)
Brian Wolfman
(D.C. Bar No. 427491)
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, D.C.  20009
(202) 588-1000
(202) 588-7795 (fax)

*Counsel for Plaintiff*

Dated:  August 8, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ED BRAYTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      Civil Action No. 08-0855 (RMU) |
| | ) |
| OFFICE OF THE UNITED STATES | ) |
| TRADE REPRESENTATIVE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND
RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rules 7(h) and 56.1, and in support of Plaintiff's Cross-Motion for

Summary Judgment and in opposition to Defendant's Motion for Summary Judgment, plaintiff

submits this Statement of Material Facts as to which there is no genuine issue and responds to

defendant's Statement of Material Facts (included in Docket No. 6). Paragraph numbers 1-5

below correspond to the paragraph numbering of defendant's Statement of Material Facts.

Paragraphs 6-29 set forth additional material facts that are not in dispute.

**Plaintiff's Response to Defendant's Statement of Material Facts**

1.     Plaintiff does not dispute statement 1.

2.     Plaintiff has no personal knowledge regarding whether statement 2 is correct that

defendant possesses only one document that is responsive to plaintiff's request.

3.     Plaintiff does not dispute statement 3, except to the extent that it suggests that the

responsive document withheld by defendant Office of the U.S. Trade Representative ("USTR")

was properly classified pursuant to Executive Order 13292 and is therefore subject to

withholding under Exemption 1.  Whether the responsive document was properly classified is a legal issue in dispute in this case.

4.  Plaintiff does not dispute statement 4, except to the extent that it suggests that the responsive document was properly classified by Ms. Julia Christine Bliss pursuant to Executive Order 13292 and is therefore subject to withholding under Exemption 1.  Whether the responsive document was properly classified is a legal issue in dispute in this case.

5.  Plaintiff disputes statement 5 to the extent that it suggests that the document withheld by USTR was properly classified by Bliss pursuant to Executive Order 13292 and is therefore subject to withholding under Exemption 1.  Whether the responsive document was properly classified is a legal issue in dispute in this case.

**Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue**

6.  The United States is a member of the World Trade Organization ("WTO"), a 153-member international trading organization based in Geneva.  Declaration of Mary Bottari ¶ 2 ("Bottari Decl.") (submitted with plaintiff's cross-motion for summary judgment and opposition to defendant's motion for summary judgment).  The WTO administers and enforces the General Agreement on Trade in Services ("GATS"), to which the United States is a signatory.  *Id.* ¶ 4. Specific GATS rules apply to the service sectors of the economy that member nations sign up, or "commit," to be bound by the terms of the agreement.  *Id.* ¶ 5.

7.  The objective of GATS is to guarantee foreign service providers access to other WTO members' markets.  Domestic policies that conflict, whether intentionally or unintentionally, with the constraints or obligations established in the GATS text, are subject to

challenge and the imposition of commercial sanctions through the binding dispute resolution system built into the WTO. *Id.* ¶ 6. The United States's inclusion of particular service sectors in its schedule of commitments can have significant domestic policy ramifications, sometimes unintended. *Id.* ¶ 7.

8. In 2003, the Caribbean island nation of Antigua filed a suit against the United States with the WTO for resolution by a formal dispute resolution panel. Antigua contended that the cumulative impact of three U.S. federal anti-racketeering laws prevented Antiguan-domiciled gambling providers from supplying gambling and betting services to U.S. customers. *Id.* ¶ 9.

9. In November 2004, a WTO panel ruled against the United States, and in April 2005, the WTO Appellate Body upheld the ruling in favor of Antigua. *Id.* ¶ 10. The Appellate Body found that, regardless of U.S. intent, the U.S. gambling and betting services sector was encompassed within the category of "other recreational services," which the United States had "committed" to comply with WTO rules without reservation. *Id.* The Appellate Body held that U.S. laws restricting cross-border gambling were in violation of the United States's "market access" obligations under GATS. *Id.*

10. The United States did not change its gambling laws in response to the ruling, and in March 2007, the WTO dispute resolution panel ruled that the United States had failed to bring its laws into compliance with the decision of the Appellate Body, a decision that opened the door for Antigua to recover trade sanctions. *Id.* ¶ 14.

11. On May 4, 2007, USTR publicly announced in a statement that the United States had notified the WTO that it was invoking procedures under GATS Article XXI to modify its commitment regarding "other recreational services" to exclude gambling and betting services.

3

*Id.* ¶ 15.  The press release is available at http://www.ustr.gov/Document_Library/

Press_Releases/2007/May/Section_Index.html.

      12.     Under GATS Article XXI, a member state may modify or withdraw a service

sector committed to WTO jurisdiction, but only after negotiating with WTO member countries

interested in the service sector over compensation for future lost revenue, such as through

monetary compensation or the grant of new WTO concessions.  Bottari Decl. ¶ 15; Declaration

of Julia Christine Bliss ("Bliss Decl.") ¶ 5 (Docket No. 6-2) (submitted by defendant in support

of its motion for summary judgment).   If the modifying member and any affected member do not

reach agreement, the affected member may refer the matter to arbitration.  Bottari Decl. ¶ 15.

      13.     The United States entered into negotiations on compensation with several

interested countries.  *Id.* ¶ 16.  On December 17, 2007, USTR issued a public statement

announcing that it had reached a settlement under the GATS Article XXI process with Canada,

the European Union ("EU"), and Japan, which stated in part:

> We are pleased to confirm that the United States has reached agreement in the
> GATS Article XXI process with Canada, the EU and Japan.  The agreement
> involves commitments to maintain our liberalized markets for warehousing
> services, technical testing services, research and development services and postal
> services relating to outbound international letters.  These commitments meet our
> WTO obligation under GATS Article XXI to make a compensatory adjustment in
> our WTO services commitments.

*Id.*  USTR's December 17, 2007 press release, along with a December 21, 2007 press release also

referring to the compensation agreement, is available at http://www.ustr.gov/Document_Library/

Press_Releases/2007/December/Section_Index.html.

      14.     On December 19, 2007, after learning that a USTR spokesperson had announced

the agreement between the United States and the EU, plaintiff Ed Brayton submitted a request

pursuant to the Freedom of Information Act ("FOIA") via electronic mail to USTR.  The request sought "the full text of the settlement between USTR and the European Union regarding America's online gambling laws."  Declaration of Ed Brayton ("Brayton Decl.") ¶ 2 (submitted with plaintiff's cross-motion for summary judgment and opposition to defendant's motion for summary judgment); Bliss Decl., Exh. 1.

15.    By letter dated January 28, 2008, signed by Carmen Suro-Bredie, Chief FOIA Officer, defendant USTR denied plaintiff's FOIA request.  Ms. Suro-Bredie wrote that "the document you seek is being withheld in full pursuant to 5 U.S.C. § 552(b)(1), which pertains to information that is properly classified in the interest of national security pursuant to Executive Order 12958."  Brayton Decl. ¶ 3 & Exh. A.

16.    By letter dated February 21, 2008, plaintiff submitted an administrative appeal of USTR's denial of his FOIA request, questioning USTR's assertion that the settlement was exempt from disclosure.  Brayton Decl. ¶ 4 & Exh. B.

17.    By letter dated March 25, 2008, signed by Mark Linscott, Chair, Freedom of Information Appeals Committee, defendant rejected plaintiff's administrative appeal.  Mr. Linscott stated that the agency's appeals committee had "determined that the document was properly withheld in full pursuant to 5 U.S.C. § 552(b)(1)" because it was properly classified pursuant to paragraph 1.4(b) of Executive Order 12958, as amended by Executive Order 13292. The letter also stated that "[o]nce the multinational negotiating process is complete, the adjustments to the United States schedule of commitments will become public information." Brayton Decl. ¶ 5 & Exh. C.

18.     According to her declaration, Bliss decided to classify the joint letter and report

that constituted the U.S. - EU compensation settlement agreement as "foreign government

information" under category 1.4(b) of Executive Order 12958, as amended (now numbered

Executive Order 13292).  Bliss Decl. ¶ 7.  Bliss relied on the definition of "foreign government

information" set forth in Executive Order 13292 § 6.1(r): "information produced by the United

States Government pursuant to or as a result of a joint arrangement with a foreign government or

governments, or an international organization of governments, or any element thereof, requiring

that the information, the arrangement, or both, are to be held in confidence."  Bliss Decl. ¶ 7.

Bliss concluded that the procedures governing GATS Article XXI modification of schedules

required the United States to keep the compensation settlement agreement secret.  *Id.* ¶¶ 6-7.

19.     In concluding that the United States was required to keep the U.S. - EU

compensation settlement agreement secret, Bliss relied on paragraph 5 of the WTO Document

S/L/80, Procedures for the Implementation of Article XXI of the General Agreement on Trade in

Services (GATS).  Bliss Decl. ¶¶ 6-7, 13 & Exh. 2.  The declaration does not state that Bliss

classified the compensation settlement agreement because the document contained sensitive

information.  Instead, her classification decision was categorical, based on the type of document

at issue.  *See id.* ¶¶ 5-7, 13.

20.     Paragraph 5 of WTO Document S/L/80, on which the Bliss Declaration relies,

provides:

> Upon completion of each negotiation conducted under paragraph 2(a) of Article
> XXI, the modifying Member shall send to the Secretariat a joint letter signed by
> the Members concerned, together with a report concerning the results of the
> negotiations which shall be initialled by the Members concerned.  The Secretariat
> will distribute the letter and the report to all Members in a secret document.

Bliss Decl., Exh. 2, ¶ 5.

21.    Similarly, paragraph 1 of Document S/L/80 requires that the Secretariat will distribute "in a secret document" to all other WTO members the modifying member's official notification that it intends to modify or withdraw a scheduled commitment pursuant to GATS Article XXI. *Id.*, Exh. 2, ¶ 1. USTR publicly announced in its press release of May 4, 2007 that it had provided such an official notification. Bottari Decl. ¶ 15; *see* USTR May 4, 2007 Press Release, *available at* http://www.ustr.gov/Document_Library/Press_Releases/2007/May/ Section_Index.html. Paragraph 6 of Document S/L/80 requires the same distribution procedure by the Secretariat for the modifying member's final report after it has reached agreement with all members that have filed claims. Bliss Decl., Exh. 2, ¶ 6.

22.    Document S/L/80 says nothing about requiring the modifying WTO member (here, the United States) or any other WTO member, to keep confidential a compensation agreement into which it has entered. It addresses only the Secretariat's obligation to distribute such an agreement to other WTO members in a secret document. Bliss Decl., Exh. 2.

23.    It is the United States's policy to make its written submissions to WTO dispute resolution bodies available to the public as soon as they are submitted. 65 Fed. Reg. 36501, 36502 (2000). USTR's website includes U.S. submissions to WTO dispute resolution panels, arbitrators, and the appellate body not only in the Antigua gambling dispute, but for all WTO disputes, pending and concluded, to which the United States is a party. *See* http://www.ustr.gov/Trade_Agreements/Monitoring_Enforcement/Dispute_Settlement/ WTO/Section_Index.html. Similarly, the United States makes public through the State Department's website its submissions to tribunals resolving disputes arising under the North

American Free Trade Agreement ("NAFTA") Chapter 11, which established an investor-state

dispute resolution system.  *See* http://www.state.gov/s/l/c3741.htm.  These submissions to the

WTO and NAFTA tribunals involve the United States's positions in ongoing disputes.

24.     In addition, the United States has made public its "offers" on services in trade

negotiations that were part of what is known as the "Doha Round" of negotiations.  *See* Initial

U.S. Services Offer to the WTO (2003), *available at* http://ustr.gov/Trade_Sectors/Services/

2003_US_Services_Offer/Section_Index.html; Revised U.S. Services Offer to the WTO (2005),

*available at* http://ustr.gov/Trade_Sectors/Services/2005_Revised_US_Services_Offer/

Section_Index.html.

25.     USTR does not contend that its policy of making public its submissions to

international trade dispute tribunals and statements of U.S. positions in trade negotiations has led

other nations to refuse to negotiate with the United States on terms favorable to the United States

or resulted in other damage to U.S. national security.

26.     In discussing her conclusion that disclosure of the compensation settlement

agreement reasonably could be expected to result in damage to the national security, Bliss refers

in her declaration to plaintiff's FOIA request as seeking "negotiation documents."  Bliss Decl.

¶¶ 11-12.  It also asserts that foreign governments will be less willing to engage in trade

negotiations with the United States if the United States "unilaterally disclose[s] to the public

information exchanged in confidence in the course of negotiations."  *Id.* ¶ 12.

27.     Plaintiff's FOIA request sought neither "negotiating documents" nor "information

exchanged in confidence in the course of the negotiations."  He asked for the settlement

agreement itself following USTR's announcement of the agreement.  *See* Brayton Decl. ¶ 2 & Bliss Decl., Exh. 1.

28.     The Bliss Declaration states that in Bliss's judgment, public release by the United States of the compensation agreement would damage the trust that other WTO members have in the United States to protect trade negotiating documents "that are exchanged with the expectation that they will be kept confidential."  Bliss Decl. ¶ 11; *see also id.* ¶ 12 (referring to "information exchanged in confidence").  The declaration provides no factual support for the assertion that the compensation agreement is a document that was "exchanged with the expectation" that it would "be kept confidential."  *See* Bliss Decl.

29.     In classifying the joint letter and report containing the U.S. - EU compensation agreement, Bliss determined that the procedures specified in paragraph 5 of WTO Document S/L/80 "call for agreements and reports negotiated under GATS Article XXI:2(c) to be treated as 'secret' in their entirety."  Bliss Decl. ¶ 13.  Accordingly, Bliss classified the joint letter and report in its entirety without segregating and releasing any portion of the compensation agreement.

Respectfully submitted,


  /s/ *Bonnie I. Robin-Vergeer*
Bonnie I. Robin-Vergeer
(D.C. Bar No. 429717)
Adina H. Rosenbaum
(D.C. Bar No. 490928)
Brian Wolfman
(D.C. Bar No. 427491)
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, D.C.  20009
(202) 588-1000
(202) 588-7795 (fax)

*Counsel for Plaintiff*

Dated:  August 8, 2008

10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ED BRAYTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-0855 (RMU) |
| | ) | |
| OFFICE OF THE UNITED STATES | ) | |
| TRADE REPRESENTATIVE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF ED BRAYTON**

In support of Plaintiff's Cross-Motion for Summary Judgment and in Opposition to

Defendant's Motion for Summary Judgment, I, Ed Brayton, declare as follows:

1.      I am the plaintiff in this case.  I serve as a fellow in the New Journalist Program of

The Center for Independent Media ("CIM"), a nonprofit 501(c)(3) organization that fosters a

diversity of ideas in national debate by educating and training people on the use of new

communications technologies such the Internet as an alternative to traditional broadcast and print

media.  I am also a journalist for the Michigan Messenger, an online publication sponsored by

CIM, *see* http://www.michiganmessenger.com, and for an online blog called "Dispatches from

the Culture Wars."  *See* http://scienceblogs.com/dispatches.  I have written extensively on the

subject of U.S. online gambling restrictions and their implications for international trade.

2.      On December 19, 2007, after learning that a spokesperson for defendant Office of

the United States Trade Representative ("USTR") had announced a settlement between USTR

and the European Union ("EU") regarding online gambling laws in the United States, I submitted

a request pursuant to the Freedom of Information Act ("FOIA") via electronic mail to USTR.

My request sought "the full text of the settlement between USTR and the European Union

regarding America's online gambling laws."  My request alluded to the fact that the agreement

had just been announced publicly by the USTR spokesperson.  A copy of my request is attached

as Exhibit 1 to the Declaration of Julia Christine Bliss, submitted by USTR in support of its

motion for summary judgment.

3.     By letter dated January 28, 2008, signed by Carmen Suro-Bredie, Chief FOIA

Officer, defendant USTR denied my FOIA request.  Ms. Suro-Bredie wrote that "the document

you seek is being withheld in full pursuant to 5 U.S.C. § 552(b)(1), which pertains to information

that is properly classified in the interest of national security pursuant to Executive Order 12958."

A copy of the USTR letter denying my FOIA request is attached hereto as Exhibit A.

4.     By letter dated February 21, 2008, I submitted an administrative appeal of

USTR's denial of my FOIA request, questioning USTR's assertion that the settlement was

exempt from disclosure.  In my appeal, I contended:  "The document in question does not deal

with any issues of national security or foreign policy," but "deals with a negotiated settlement of

a trade dispute involving purely domestic policy in the US."  My appeal continued:  "[T]he

settlement almost certainly entails a substantial financial cost to American taxpayers, either in

direct payments as restitution to other nations or as a result of allowing them to enact trade

barriers and tariffs against American goods and services in order to balance off the negative

effect of our online gambling laws.  Analysts have estimated that the cost could be in the tens of

billions of dollars to American taxpayers, who surely have a legitimate right to know what kind

of trade settlements their government is cutting with other countries at our expense."  I found it

"virtually inconceivable that the release of that settlement to the public could possibly harm

2

national security in any way." An unsigned copy of my agency appeal is attached hereto as Exhibit B.

5.    By letter dated March 25, 2008, signed by Mark Linscott, Chair, Freedom of Information Appeals Committee, USTR rejected my administrative appeal. Mr. Linscott stated that the agency's appeals committee had "determined that the document was properly withheld in full pursuant to 5 U.S.C. § 552(b)(1)" because it was properly classified pursuant to paragraph 1.4(b) of Executive Order 12958, as amended by Executive Order 13292. That paragraph provides that "foreign government information" must be treated as "classified national security information." Mr. Linscott's letter further stated: "Executive Order 13292 defines 'foreign government information' as information provided to, or received from, a foreign government or international organization under an agreement that it will be held in confidence." The letter stated that the document I requested "contains an agreement between the United States and the European Union entered into as part of a multinational process under the purview of the World Trade Organization (WTO)." According to USTR, "[t]he WTO rules governing this process require that such documents must be held in confidence. Therefore, the document is 'foreign government information' properly classified under Executive Order 12958, as amended by Executive Order 13292." USTR contended that "[o]nce the multinational negotiating process is complete, the adjustments to the United States schedule of commitments will become public information." A copy of USTR's letter denying my administrative appeal is attached hereto as Exhibit C.

6.    I continue to believe that USTR has unlawfully withheld its settlement with the EU. If USTR's refusal to disclose the document is upheld, it will mean that the United States has

has the right to reach settlements with other nations in which the United States agrees to make

trade concessions and undertake new binding trade commitments, with significant public

domestic policy consequences, but without any public knowledge or involvement.


I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.


Executed this  [4th]   day of August, 2008.


_    /s/ Ed Brayton_____
Ed Brayton, Plaintiff

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE

WASHINGTON, D.C. 20508

EXHIBIT A

January 28, 2008

Mr. Ed Brayton
Center for Independent Media
110 ½ Sutherland
Stanton, MI 48888

Dear Mr. Brayton:

This is USTR's response to your request for **"a copy of the full text of the settlement between the USTR and the European Union regarding America's online gambling laws",** under the Freedom of Information Act.

Please be advised that the document you seek is being withheld in full pursuant to 5 U.S.C . §552(b)(1), which pertains to information that is properly classified in the interest of national security pursuant to Executive Order 12958.

Inasmuch as this constitutes a complete grant of your request, I am closing your file in this office. In the event that you are dissatisfied with USTR's determination, you may appeal such a denial, within thirty (30) days, in writing to:

> FOIA Appeals Committee
> Office of the United States Trade Representative
> 1724 F Street, N.W.
> Washington, DC 20508

Both the letter and the envelope should be clearly marked: "Freedom of Information Act Appeal". In the event you are dissatisfied with the results of any such appeal, judicial review will thereafter be available to you in the United States District Court for the judicial district in which you reside or have your principal place of business, or in the District of Columbia, where we searched for the records you seek. Should you have any questions, please feel free to contact me or my assistant Jacqueline Caldwell at (202) 395-3419.

Sincerely,

Carmen Suro-Bredie
Chief FOIA Officer

Case File #07121839

EXHIBIT B

February 21, 2008
Carmen Suro-Bredie
Chief FOIA Officer
US Trade Representative

RE: Freedom of Information Act Appeal

To whom it may concern:

The purpose of this letter is to initiate an appeal of your office's denial of my FOIA request for a copy of the full text of the settlement agreement negotiated by the USTR with the European Union in regard to the WTO dispute over the validity of America's current legal stance on online gambling. That request was denied on Jan. 28th.

The basis of the denial, according to the letter I received, was that the text of this settlement is "properly classified in the interest of national security pursuant to Executive Order 12958." I seek an appeal of that determination. I believe this determination is legally and factually dubious.

The document in question does not deal with any issues of national security or foreign policy, it deals with a negotiated settlement of a trade dispute involving purely domestic policy in the US. Moreover, the settlement almost certainly entails a substantial financial cost to American taxpayers, either in direct payments as restitution to other nations or as a result of allowing them to enact trade barriers and tariffs against American goods and services in order to balance off the negative effect of our online gambling laws. Analysts have estimated that the cost could be in the tens of billions of dollars to American taxpayers, who surely have a legitimate right to know what kind of trade settlements their government is cutting with other countries at our expense.

It is virtually inconceivable that the release of that settlement to the public could possibly harm national security in any way. In light of that and the fact that the public has a clear right to know what is being bargained away in their name, I ask that the denial of this request be reversed and the full text of this settlement be produced for me, either in electronic or hard copy format, as soon as practically possible.

Sincerely,


Ed Brayton

**EXHIBIT C**

March 25, 2008

Mr. Ed Brayton
Center for Independent Media
110 ½ Sutherland
Stanton, MI 48888

Dear Mr. Brayton:

This letter is in response to your appeal dated March 10, 2008 to the Freedom of Information Appeals Committee (Committee) of the Office of the United States Trade Representative (USTR) from USTR's response to your request for documents, received on December 19, 2007.

Your request was for "a copy of the full text of the settlement between the USTR and the European Union regarding America's online gambling laws." On January 28, 2008 the Chief FOIA Officer of USTR informed you that the document you were seeking was being withheld in full pursuant to 5 U.S.C. § 552 (b)(1), which pertains to information that is properly classified in the interest of national security pursuant to Executive Order 12958.

After review, the Committee has determined that the document was properly withheld in full pursuant to 5 U.S.C. § 552 (b)(1) because it is a document properly classified as "Classified National Security Information" in accordance with paragraph 1.4(b) of Executive Order 12958, as amended by Executive Order 13292. Paragraph 1:4(b) provides that "foreign government information" must be treated as "classified national security information". Executive Order 13292 defines "foreign government information" as information provided to, or received from, a foreign government or international organization under an agreement that it will be held in confidence. *See* Section 6.1, paragraph (r).

The document you requested contains an agreement between the United States and the European Union entered into as part of a multinational process under the purview of the World Trade Organization (WTO). The WTO rules governing this process require that such documents must be held in confidence. Therefore, the document is "foreign government information" properly classified under Executive Order 12958, as amended by Executive Order 13292. Once the multinational negotiating process is complete, the adjustments to the United States schedule of commitments will become public information.

EXHIBIT C

Mr. Ed Brayton
Page 2


In the event you are dissatisfied with the results of this appeal, you may seek judicial review in
the United States District Court for the judicial district in which you are located or have your
principal place of business, or in the District of Columbia, as provided in 5 U.S.C.
§ 552(a)(4)(B).

Sincerely,

Mark Linscott, Chair
Freedom of Information Appeals
 Committee


cc:    Jacqueline Caldwell, FOIA Officer
       Appeals Committee Members

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ED BRAYTON,                                )
                                           )
              Plaintiff,                   )
                                           )
v.                                         )        Civil Action No. 08-0855 (RMU)
                                           )
OFFICE OF THE UNITED STATES                )
TRADE REPRESENTATIVE,                      )
                                           )
              Defendant.                   )
                                           )

**DECLARATION OF MARY BOTTARI**

In support of Plaintiff's Cross-Motion for Summary Judgment and in Opposition to

Defendant's Motion for Summary Judgment, I, Mary Bottari, declare as follows:

1.      I am the Director of the Harmonization Project of Public Citizen's Global Trade

Watch ("Global Trade Watch").  The mission of Global Trade Watch is to educate the American

public about the enormous impact of international trade and economic globalization on our jobs,

the environment, public health and safety, and democratic accountability.  The Harmonization

Project monitors the impact of global trade agreements on domestic rules and regulations at the

federal, state, and local levels, such as on our environmental, public health, food and product

safety laws, and on our domestic rulemaking procedures.  The Harmonization Project focuses on

the implications for democratic governance and sovereignty when these policies are challenged

as "barriers to trade" or are otherwise implicated in international dispute resolution systems, such

as those of the World Trade Organization ("WTO") or the North American Free Trade

Agreement.

2.      Among my responsibilities are monitoring and reporting on the implications of trade disputes that arise between the United States and other nations under the auspices of the WTO.  Established in 1995 as a successor to the 1947 General Agreement on Tariffs and Trade ("GATT"), the WTO is a 153-member international trading organization based in Geneva.  The WTO administers and enforces 17 primary agreements, a minority of which actually have to do with traditional trade issues such as limiting tariffs and quotas on goods.  The WTO enforces agreements that cover trade in goods, market access and regulation of services, foreign investors and investment, intellectual property, procurement, product and food safety, and other policies. The United States is a member of the WTO and, as such, is legally bound by the rules contained in these trade agreements.  As Article XVI.4 of the Agreement Establishing the World Trade Organization provides:  "Each Member shall ensure the conformity of its laws, regulations and administrative procedures with its obligations as provided in the annexed Agreements."  *See* http://www.wto.org/english/docs_e/legal_e/04-wto.pdf.  The other 152 WTO signatory countries are empowered to challenge nonconforming U.S. federal and state policies as violations of WTO agreements before trade tribunals in WTO's binding dispute resolution system.  The tribunals are staffed by trade officials who are empowered to judge if a U.S. law violates WTO requirements. Policies judged to violate the WTO rules must be changed or commercial sanctions worth millions of dollars can be imposed.  (The WTO maintains a website that provides a wealth of information regarding its establishment and operations and access to the underlying agreements and official WTO documents.  *See* http://www.wto.org.)

3.      The goal of the WTO and its underlying agreements is to establish a uniform system of global governance on an array of trade and non-trade matters and to "liberalize" international commerce by eliminating "barriers" to trade and investment among nations.  The

2

WTO extends beyond reduction or elimination of tariffs to also proscribe what it deems to be "non-tariff" barriers.  Non-tariff barriers are broadly defined in the WTO to include diverse domestic regulatory policies pursued by nations that deliberately or inadvertently limit trade between nations or restrict the ability of foreign firms to operate in the territory of another WTO member country.  The pros and cons of the WTO are not at issue in this case.  Suffice it to say, however, that, as the highly publicized collapse of WTO trade talks in Seattle in 1999 and the most recent collapse of the WTO's "Doha Round" have demonstrated, the WTO has proved to be highly controversial and is frequently criticized as a nontransparent and undemocratic institution operating in a manner that more highly values opening markets and limiting government non-trade regulatory policy for the benefit of multinational corporations than member states' rights to regulate for the public good.

4.    The key WTO trade agreement that is relevant to this Freedom of Information Act ("FOIA") dispute is the General Agreement on Trade in Services ("GATS"), *available at* http://www.wto.org/english/docs_e/legal_e/26-gats_01_e.htm, a binding international commercial pact that was part of the original GATT "Uruguay Round" package of trade agreements enforced by the WTO and to which the United States is a signatory.  (For a summary of the agreement, see http://www.wto.org/english/docs_e/legal_e/ursum_e.htm#mAgreement.) GATS proscriptions and obligations not only apply to traditional "trade in services" *across* borders (for example, tax services provided over the Internet, or computer services provided by phone), but also grant foreign corporations the rights to buy, establish, invest in, or otherwise operate service-sector companies *within the territories* of other WTO member countries.  (For example, many foreign banks, insurance firms, and retail firms have entered the United States since the implementation of the GATS.)  Such foreign service providers operating within the

3

United States may be regulated only pursuant to policies that do not extend beyond the constraints set by a series of GATS rules—constraints with significant public interest and democratic governance implications.  GATS governs measures taken by member nations, including measures taken by central, regional, or local governments, as well as by authorities and non-governmental bodies exercising powers delegated by central, regional, or local governments or authorities.  *See* GATS Art. I.  Thus, a diverse array of federal, state, and local domestic laws that apply to *all* firms operating within the United States, but which may inadvertently constrain foreign service providers' activities or operations in the U.S. market or impede cross-border trade, can be considered "non-tariff" barriers to trade and potential WTO violations.

5.      Specific GATS rules apply to the service sectors of the economy that member nations sign up, or "commit," to be bound by the terms of the agreement.  *See* GATS Art. XX (describing members' obligation to set out schedules of specific commitments).  For example, the U.S. has committed in its official GATS "schedule of commitments" almost 100 service sectors—such as financial services (including health insurance), communications services, business and professional services, distribution services, environmental services, tourism and travel services, health related services, educational services, transportation services, and recreation services (including gambling services)—to GATS requirements with little public discussion, congressional debate, or understanding.  *See* The United States of America: Schedule of Specific Commitments, GATS/SC/90.  Many of these services are regulated by state and local governments that were not meaningfully consulted before these service sectors were bound to GATS constraints.

6.      For all scheduled service sectors, subject to any reservations specifically listed in the schedule and other exceptions specified in the agreement, the member nation commits to

conform its domestic policy to the constraints and obligations included in the GATS text.  For example, the member nation commits to provide "market access" to foreign service providers and to accord such services and their suppliers "national treatment"—that is, treatment "no less favourable" than the member would accord its own like services and service suppliers.  *See* GATS Art. XVI (Market Access) & Art. XVII (National Treatment).  Also included are explicit additional limits on domestic regulation of such services.  *See* GATS Art. VI (Domestic Regulation).  The objective of GATS is to guarantee foreign service providers access to other WTO members' markets.  Domestic policies that conflict, whether intentionally or unintentionally, with the constraints or obligations established in the GATS text, are subject to challenge and the imposition of commercial sanctions through the binding dispute resolution system built into the WTO.  *See* GATS Art. XXIII (Dispute Settlement and Enforcement).

7.      The inclusion by the United States of particular service sectors in its schedule of commitments can have significant domestic policy ramifications, sometimes unintended, which underscores the importance of subjecting U.S. decisions to include a particular service sector in its GATS schedule of commitments to public scrutiny and debate.  The long running dispute between the Caribbean island nation of Antigua and the United States over cross-border, or remote, access to gambling and betting services (such as via the Internet) is a case-in-point and forms the backdrop to the settlement document that plaintiff Ed Brayton seeks under FOIA.  I have closely followed the proceedings in this dispute and have provided a summary of the dispute through March 2007 on the Public Citizen website.  *See* http://www.citizen.org/ documents/Gamblingsummary2007.pdf.

8.      In the 1990s, Internet gambling became a booming industry.  A tiny island with few resources, Antigua capitalized on the boom; at one point, the nation was home to 120

5

gambling companies providing employment and significant contribution to the country's GNP. These firms marketed to U.S. customers, who represented the majority of their market. In 1998, U.S. prosecutors decided to crack down on one of these Antiguan Internet gambling firms owned by an American and providing services to U.S. customers. The enforcement action threw Antigua's lucrative industry into an uproar, allegedly costing the country billions in revenue.

9.      In 2003, Antigua filed a suit against the United States with the WTO for resolution by a formal WTO dispute resolution panel. Antigua contended that the cumulative impact of three U.S. federal anti-racketeering laws (the Wire Act, 18 U.S.C. § 1084; the Travel Act, 18 U.S.C. § 1952; and the Illegal Gambling Business Act ("IGBA"), 18 U.S.C. § 1955), which predate both the establishment of the WTO and the business of Internet gambling, prevented Antiguan-domiciled gambling providers from supplying gambling and betting services to U.S. customers. In response, U.S. trade lawyers argued that the United States had not intentionally included the gambling and betting sector in its schedule of commitments under GATS, and hence, its gambling laws were not subject to WTO rules.

10.      In November 2004, a WTO panel ruled against the United States, and in April 2005, the WTO Appellate Body upheld the ruling. The Appellate Body found that, regardless of U.S. intent, the U.S. gambling and betting services sector was encompassed within the category of "other recreational services," which the United States had "committed" to comply with WTO rules without reservation. The Appellate Body also held that restrictions amounting to a total prohibition, or ban, on several or all means of delivery of cross-border gambling services in a committed service sector constituted a "zero quota" that was inconsistent with U.S. obligations under GATS. Accordingly, the Appellate Body ruled that U.S. laws that implemented what was essentially a cross-border gambling ban violated the United States's WTO "market access"

6

obligations.  *See* Report of the Appellate Body, United States—Measures Affecting the Cross-

Border Supply of Gambling and Betting Services, ¶¶ 252, 265, WT/DS285/AB/R (Apr. 7, 2005).

The Appellate Body's decision and WTO panel and arbitrator rulings are available at

http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds285_e.htm.

      11.     As its opinion explained, the Appellate Body was prepared to hold that U.S. laws

restricting remote access gambling nonetheless were "necessary to protect public morals or to

maintain order" and thus would be exempt from the GATS market access requirements, *see*

GATS Art. XIV, except that the Appellate Body found that the U.S. restrictions were applied in a

discriminatory manner, rendering the exemption inapplicable.  The U.S. Interstate Horseracing

Act ("IHA"), 15 U.S.C. § 3002, authorizes interstate off-track wagers on horseraces placed or

transmitted in one state and accepted in the same or another state, if certain conditions are met.

The Appellate Body construed that statute as authorizing *domestic* service suppliers, but not

*foreign* service suppliers, to offer remote betting services in relation to horse races.  The

Appellate Body found that the United States failed to demonstrate that the remote supply of

wagering on horseracing services by domestic suppliers is prohibited.  Thus, it ruled that the

United States did not qualify for the "public morals" exemption and that the Wire Act, the Travel

Act, and the IGBA violated the United States's market access obligations.  Report of the

Appellate Body ¶¶ 371-72.

      12.     To comply with the ruling, the United States had little choice but to either repeal

its restrictions on remote access to gambling or repeal the exception allowed for cross-state off-

site horserace gambling.  Although this particular case involved cross-border access to gambling

services, the Appellate Body's reasoning regarding restrictions on numbers of service suppliers

was far-reaching in its implications.  As a result of the WTO ruling, an array of common state

and local regulations relating to gambling were put at risk of WTO challenge, such as limits on

the number of service suppliers (*e.g.*, the number of casinos), monopolies (*e.g.*, "monopolistic"

state lotteries), and exclusive service provider arrangements (*e.g.*, Indian gaming compacts).

And although the Appellate Body held that insufficient evidence had been presented to warrant

consideration of whether gambling restrictions enacted by several states *also* violated the U.S.

commitment under GATS, its decision that the United States had committed its gambling and

betting service sector and that regulatory bans were considered a "quota of zero," meant that a

variety of state restrictions on gambling also were at risk of challenge under the WTO, as were

regulatory bans in dozens of other (non-gambling-related) service sectors. As one commentator

wrote:  "The WTO Appellate body's ruling in a GATS case involving US gambling laws opens

the door wide to challenges against a broad range of regulations."  Ellen Gould, Canadian Centre

for Policy Alternatives, *How the GATS Undermines the Right to Regulate: Lessons from the US-

Gambling Case* (Nov. 28, 2005), *available at* http://www.policyalternatives.ca/

index.cfm?call=6104EA04.

13.    In response to the WTO decision, 29 state attorneys general led by the Attorney

General of Utah, a state where all forms of gambling are prohibited, wrote a letter to the U.S.

Trade Representative raising serious concerns about the implications of the ruling for state

regulation of gambling in particular and for state regulatory authority in general.  The state

officials wrote that "it is vital to maintain the principle that the federal government may request,

but not require, states to alter their regulatory regimes in areas over which the states hold

constitutional authority."  The attorneys general also expressed concern regarding the process

used to consult with states regarding trade negotiations and the possibility of future

encroachments on states' regulatory authority.  The letter by the state attorneys general is

available on the Public Citizen website at http://www.citizen.org/documents/

29AGs_GATS_May2005.pdf.   Similarly, the National Conference of State Legislatures issued a

policy paper on Free Trade and Federalism, which stated:  "The WTO gambling suit illustrates

the dangers of committing service sectors without a thorough vetting by appropriate state

officials."  The National Conference called on the USTR "to consult effectively, meaningfully,

and timely with the states as USTR negotiates compensatory concessions to our trading

partners."  The NCSL policy on Free Trade and Federalism can be found at

http://www.ncsl.org/standcomm/sclaborecon/sclaborecon_Policies.htm#FreeTrade.

      14.     The United States did not change its gambling laws, and, in March 2007, the

WTO panel ruled that the United States had failed to bring its federal gambling laws into

compliance with the decision of the Appellate Body; the panel's decision opened the door to

recovery of trade sanctions by Antigua.  *See* Report of the Panel, United States—Measures

Affecting the Cross-Border Supply of Gambling and Betting Services: Recourse to Article 21.5

of the DSU by Antigua and Barbuda, WT/DS285/RW (Mar. 30, 2007).  (Subsequently, in

December 2007, a WTO arbitration panel held that Antigua was permitted to request

authorization to suspend obligations to the United States under its intellectual property

agreement, not to exceed $21 million annually.)  Other WTO countries threatened to launch

additional WTO challenges to additional U.S. gambling policies.  For example, in 2006,

Congress enacted a more direct ban on Internet gambling called the Unlawful Internet Gambling

Enforcement Act.  *See* 31 U.S.C. § 5361 *et seq.*  The law more stringently regulates Internet

gambling by prohibiting banks and credit card firms from processing and paying Internet

gambling bets (while making no changes to the IHA), leading EU officials to threaten a WTO

case challenging the law.

15.    On May 4, 2007, defendant Office of the United States Trade Representative ("USTR") publicly announced in a statement that the United States had notified the WTO that it was invoking procedures under GATS Article XXI to modify its commitment regarding "other recreational services" to exclude gambling and betting services.  This was an unprecedented action by the USTR and a significant win for the state attorneys general and others who had raised concerns about the implications of the Antigua decision.  The press release is available at http://www.ustr.gov/Document_Library/Press_Releases/2007/May/Section_Index.html.  Under GATS Article XXI, a member state may modify or withdraw a service sector committed to WTO jurisdiction, but only with the authorization of other WTO signatory countries interested in the service sector and only after compensating the interested countries for future lost revenue, such as through monetary compensation or the grant of new WTO concessions.  Under GATS Article XXI.2, "the modifying member"—here, the United States—must "enter into negotiations with a view to reaching agreement on any necessary compensatory adjustment."  If agreement is not reached between the modifying member and any affected member, the affected member may refer the matter to arbitration.  GATS Art. XXI.3.

16.    The United States entered into negotiations on compensation with several interested countries.  Compensation talks occurred behind closed doors.  On December 17, 2007, USTR issued a public statement announcing that it had reached a settlement under the GATS Article XXI process with Canada, the European Union ("EU"), and Japan.  The press release is available at http://www.ustr.gov/Document_Library/Press_Releases/2007/December/Section_Index.html.  USTR announced:  "We are pleased to confirm that the United States has reached agreement in the GATS Article XXI process with Canada, the EU and Japan.  The agreement involves commitments to maintain our liberalized markets for warehousing services,

technical testing services, research and development services and postal services relating to

outbound international letters.  These commitments meet our WTO obligation under GATS

Article XXI to make a compensatory adjustment in our WTO services commitments." *See also*

USTR Press Release (Dec. 21, 2007) (available from same website).  The compensation

settlement agreement between the United States and the EU announced in USTR's press release

is the subject of plaintiff Ed Brayton's FOIA request and this lawsuit.

      17.    Without seeing the actual language of the compensation agreement, it is difficult

to analyze the potential impact of the new commitments that USTR announced would be added

to the U.S. schedule of commitments under GATS.  To avoid the same types of unintended

consequences that gave rise to the WTO Antigua gambling suit, each proposed area of

commitments would need to be assessed for the federal, state, and local laws that might be

considered to violate GATS constraints or obligations and thus be subject to challenge once these

U.S. service sectors are brought under WTO jurisdiction.  Congress, trade and technical experts,

state and local officials, attorneys general, and the public should be consulted before the United

States commits any additional service sectors of the U.S. economy to GATS requirements.

      18.    Without extensive analysis, some concerns immediately come to mind.  For

instance, under the United Nations services classification system used in the WTO GATS

negotiations, the category "warehousing and storage services" includes the subcategory of

"storage of liquids and gases."  This latter category includes natural gases, gasoline, oil, and

chemicals.  A commitment that includes the storage of such liquids and gases would not only

involve a new GATS commitment by the United States, but a commitment in a highly sensitive

area.  Not only are hazardous "tank farms" for gas, oil, and chemicals potentially covered by this

commitment, but controversial offshore liquid natural gas ("LNG") terminals may also be

covered.  The siting of LNG terminals can be enormously controversial due to the risk of

presenting a target for terrorism and the significant dangers inherent in the operation of an LNG

facility.  A ban on the establishment of an LNG facility near a major population center or other

sensitive locations could be treated as a "zero quota" and thus a WTO GATS violation under the

reasoning of the Appellate Body in the Antigua cross-border gambling dispute.  Other types of

safety or environmental protections applied by federal or state governments also potentially

could be implicated as WTO violations.  The environmental and safety laws governing common

storage and warehouse facilities such as chemical tank farms are largely state and local.  If these

policies, for example, limit the location, size, and number of tanks, they could run afoul of

GATS market access rules.  The second press release by USTR on December 21, 2007 refers to

the new U.S. commitment relating to "warehousing services" with the qualification "(excluding

services supplied at ports and airports)," but it is unclear, without seeing the text of the

compensation agreement, what hazardous warehouse and storage facilities would be excluded

from GATS WTO jurisdiction.

      19.    Also of concern is whether public funds might be affected by WTO rules

requiring that they be shared on a "national treatment," or nondiscriminatory, basis.  According

to USTR's December 17, 2007 public statement, the United States proposes to commit the

category of "research and development services" ("R&D").  The agency's second press

statement, on December 21, 2007, refers to "private research and development services."  Again,

without seeing the text of the compensation agreement and without further information about

what is meant by "private" R&D, it is difficult to gauge the concession's potential impact.  R&D

would be a new commitment of the United States in a sector worth billions in federal and state

taxpayer dollars.  According to the American Academy for the Advancement of Science, the

federal budget for FY 2007 included R&D spending authority of nearly $142 billion. *See* http://www.aaas.org/spp/rd/prev09tb.htm (Table 1). The National Science Foundation reports that state agencies spent more than $1 billion on R&D in FY 2006. *See* http://www.nsf.gov/statistics/infbrief/nsf08309 (Table 1). In 1994, the United States carefully carved out R&D subsidies from its initial WTO GATS commitments. That meant that R&D dollars were exempt across the board, under each committed service category. A new commitment regarding R&D services, a potentially major policy change achieved without public input, would have to be examined carefully to determine how and whether state and federal taxpayer dollars are safeguarded.

20.    Global Trade Watch believes that it is vitally important that before the United States adds to or modifies its GATS schedule of commitments, it subject its proposals to public scrutiny, debate, and consultation because of the serious domestic policy consequences that may accompany a decision to commit a U.S. service sector to WTO jurisdiction, as the gambling dispute has shown. We see no justification for USTR's refusal to make public in response to a FOIA request a compensation settlement agreement to which the United States is a party and that the agency itself has already publicly announced—an agreement regarding a modified U.S. Schedule of Commitments that will make law binding on all levels of government in the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.


Executed this 8th day of August, 2008.


   /s/ *Mary Bottari*       
Mary Bottari

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ED BRAYTON,                                ) | |
| )                                         | |
|     Plaintiff,        ) | |
| )                                         | |
| v.                                        )    Civil Action No. 08-0855 (RMU) | |
| )                                         | |
| OFFICE OF THE UNITED STATES          ) | |
| TRADE REPRESENTATIVE,                )     | |
| )                                         | |
|     Defendant.        ) | |
| _____)         | |

**[PROPOSED] ORDER**

This matter having come before the Court on Defendant's Motion for Summary Judgment

and Plaintiff's Cross-Motion for Summary Judgment, it is hereby

**ORDERED** that defendant's motion for summary judgment is **DENIED** and that

plaintiff's cross-motion for summary judgment is **GRANTED**.

**SO ORDERED** on this ____ day of _____, 2008.

_____
RICARDO M. URBINA
United States District Judge