**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ED BRAYTON, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:   08-0855 (RMU) |
| | : | |
| v. | : | Re Document No.:  16 |
| | : | |
| OFFICE OF THE UNITED STATES | : | |
| TRADE REPRESENTATIVE, | : | |
| | : | |
| Defendant. | : | |

<u>MEMORANDUM OPINION</u>

DENYING THE PLAINTIFF'S MOTION FOR A DETERMINATION OF HIS ELIGIBILITY FOR
AND ENTITLEMENT TO ATTORNEY'S FEES AND COSTS

**I.  INTRODUCTION**

This matter is before the court on the plaintiff's motion for a determination of his

eligibility for and entitlement to attorney's fees and costs.  The action arises out of the

plaintiff's request, made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C.

§ 552, for a copy of a compensation agreement between the United States and the

European Union ("EU").  The plaintiff contends that he substantially prevailed in his

FOIA action because the defendant, the Office of the United States Trade Representative

("USTR"), rescinded its initial denial of the plaintiff's request and disclosed the

document.  The court concludes that because the plaintiff was not entitled to an award of

attorney's fees, his motion for fees is denied.

**II.  FACTUAL & PROCEDURAL BACKGROUND**

In 2007, the United States entered into negotiations for a compensation agreement

with several interested parties, including the EU, to exclude the gambling and betting

service sector from its commitments under the General Agreement on Trade in Services ("GATS").  Pl.'s Mot. at 2.  The negotiations took place under the auspices of the World Trade Organization ("WTO").  *Id.*  In December 2007, the United States announced it had reached an agreement with the EU to modify its schedule of commitments under the GATS ("the Agreement").  *Id.*

The plaintiff was at the time a fellow in the New Journalist Program at the Center for Independent Media.  Pl.'s Mot. at 2; Second Decl. of Ed Brayton ("Pl.'s 2d Decl.") ¶ 2.  He was also a journalist for the *Michigan Messenger* and maintained a blog, "Dispatches from Culture Wars."  Pl.'s 2d Decl. ¶ 1.

On December 19, 2007, the plaintiff submitted a FOIA request seeking disclosure of the Agreement.  Def.'s Mot. for Summ. J. at 2.  In January 2008, the defendant denied the request, asserting that the Agreement fell within FOIA Exemption 1, which authorizes the nondisclosure of foreign policy and national security information.  First Decl. of Ed Brayton ("Pl.'s 1st Decl."), Ex. A.  The plaintiff subsequently filed an administrative appeal.  Pl.'s 1st Decl., Ex. B.  By letter dated March 25, 2008, the defendant denied the appeal, asserting that the Agreement constituted "foreign government information" exempted from FOIA's disclosure requirements.  Pl.'s 1st Decl., Ex. C ("March 25 Letter") at 1. Specifically, the defendant stated that the Agreement was "entered into as part of a multinational process under the purview of the World Trade Organization" and constituted foreign government information because "WTO rules . . . require that such documents . . . be held in confidence."  *Id.*  The defendant further informed the plaintiff that "[o]nce the multinational negotiating process is complete, the adjustments to the United States schedule of commitments will become public information."  *Id.*

On May 19, 2008, the plaintiff commenced suit in this court seeking to compel disclosure of the Agreement. *See generally* Compl. In June 2008, the defendant informed the plaintiff that there were some developments taking place that could potentially result in an earlier release of the Agreement. Decl. of David Apol ("Apol Decl.") ¶ 4. Counsel for the defendant had been informed by other USTR officials that the Agreement could be derestricted prior to the completion of multinational negotiations through a joint agreement between the United States and the EU. *Id*. The defendant, however, was not inclined to pursue such a joint agreement at that time because of concerns that "seeking the EU's cooperation might complicate or distract from other negotiations that were then underway." *Id*. ¶ 5. For that reason, the defendant "decided to defer entering into those discussions at that time." *Id*.

On July 9, 2008, the defendant moved for summary judgment without mentioning the possibility of disclosure through the joint agreement process. *See generally* Def.'s Mot. for Summ. J. On August 8, 2008, the plaintiff filed his opposition to the defendant's motion for summary judgment and a cross-motion for summary judgment. *Id*. In September 2008, senior USTR officials advised counsel for the defendant that pursuing the joint agreement method of derestriction would be feasible, and gave specific instruction to USTR representatives to approach the EU to discuss such an agreement. Apol Decl. ¶ 6. On September 3, 2008, the defendant moved for an extension of time to file its reply in support of summary judgment, in light of the possibility of an earlier release of the information sought. *Id*. Shortly thereafter, the defendant contacted the EU regarding a joint agreement on derestriction. Decl. of Bonnie Robin-Vergeer ("Robin-Vergeer Decl.") ¶ 4. In November 2008, the defendant and the EU jointly agreed to

derestrict the Agreement, which was then declassified and released later that month.  Pl.'s

Mot. at 9.  The plaintiff now moves for an award of attorney's fees.


### III.  ANALYSIS

#### A.  Legal Standard for Awarding Attorney's Fees and Costs Under FOIA

The FOIA provides that government agencies "shall make available to the public"

certain information upon a proper request.  5 U.S.C. § 552(a)(1).  Under the FOIA, the

court may assess "reasonable attorney's fees and other litigation costs reasonably

incurred in any case . . . in which the complainant has substantially prevailed." [1]  *Id.*

§552(a)(4)(E)(i).  A prevailing party must demonstrate both eligibility and entitlement for

an award of attorney's fees.  *Id*.  To be "eligible" for an award of attorney's fees, the

claimant must have "substantially prevailed" in the underlying FOIA litigation.  *Id.*  A

party substantially prevails if he "has obtained relief through either . . . a judicial order, or

an enforceable written agreement or consent decree[,] or . . . a voluntary or unilateral

change in position by the agency, if the complainant's claim is not insubstantial."  *Id*. §

552(a)(4)(E)(ii).

Second, the court must determine that the plaintiff is "entitled" to an award of

attorney's fees and costs.  5 U.S.C. § 552; *Weisberg v. United States*, 745 F.2d 1476,

1498 (D.C. Cir. 1984).  In deciding whether a claimant is entitled to an award of

attorney's fees and costs, the court generally considers four factors: (1) the public benefit

derived from the case; (2) the commercial benefit to the complainant; (3) the nature of the

complainant's interest in the records sought; and (4) the reasonableness of the agency's

---

[1]      When an individual files a complaint to compel the release of information under the
FOIA, the district courts may exercise jurisdiction to ensure compliance with disclosure
requirements. *See* 5 U.S.C. § 552(a)(4)(B).

withholding of the requested documents.  *Id*.; *see also Tax Analysts v. U.S. Dep't of Justice*, 965 F.2d 1092, 1093-94 (D.C. Cir. 1992).  "[E]ntitlement is at the discretion of the district court."  *Md. Dep't of Human Res. v. Sullivan*, 738 F. Supp. 555, 565 (D.D.C. 1990).  Moreover, "[a]n agency cannot foreclose an award of attorneys' fees and costs by complying with a FOIA request during the pendency of litigation."  *Id*. at 563 (citing *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1365 (D.C. Cir. 1977)).

### B.  The Court Denies the Plaintiff's Motion Because He Has Not Demonstrated His Entitlement to an Award of Attorney's Fees and Costs

Although the entitlement analysis typically involves the balancing of four factors, the Circuit has made clear that "a party is not entitled to fees if the Government's legal basis for withholding requested records is correct."  *Chesapeake Bay Found., Inc. v. U.S. Dep't of Agric.*, 11 F.3d 211, 216 (D.C. Cir. 1993) (observing that "it does not matter that information was disclosed after initial resistance, for this does not dispose of the question whether the information sought was exempt from disclosure under FOIA"); *Davy*, 550 F.3d at 1159 (noting that "[n]o one factor is dispositive, although the court will not assess fees when the agency has demonstrated that it had a lawful right to withhold disclosure").  As the Circuit has explained,

> [i]f the Government's position is correct as a matter of law, that will be dispositive.  If the Government's position is founded on a colorable basis in law, that will be weighed along with other relevant considerations in the entitlement calculus.

*Davy*, 550 F.3d at 1162 (quoting *Chesapeake Bay Found.,* 11 F.3d at 216).[2]

The defendant contends that its initial denial of the plaintiff's FOIA request was justified because WTO rules prohibited the defendant from unilaterally disclosing the Agreement.  Def.'s Opp'n at 7.  The Agreement therefore constituted "foreign government information" under Executive Order 13,292, and was exempt from disclosure under FOIA Exemption 1.  *Id.*, Def.'s Mot. For Summ. J. at 7-9.  The plaintiff maintains that the defendant had no reasonable basis for denying his request.  *See* Pl.'s Mot. at 23-32.  He argues that the WTO rules relied on by the defendant prohibit only the WTO from disclosing modifications to compensation agreements, and say nothing about whether a member state, such as the United States, may disclose such modifications to the public.  *Id.* at 25.

Although there is a "strong presumption in favor of disclosure," *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), an agency may refuse to disclose information subject to a FOIA request if that information falls within one of nine exemptions enumerated in the statute, 5 U.S.C. § 552(b)(1)-(9).  FOIA Exemption 1, the exemption on which the defendant relies, authorizes the nondisclosure of any records that are "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified

---

[2]     Contrary to the plaintiff's assertion, nothing in the OPEN Government Act of 2007, which broadened the meaning of "substantially prevailed" under the eligibility prong of the attorney's fees analysis, abrogated the well-established rule articulated in *Davy* that a party is not entitled to attorney's fees if the agency's withholding of the document was correct as a matter of law.  *See* Pub. L. No. 110-175, 121 Stat. 2524 (amending the FOIA to provide that a complainant substantially prevails if the complainant has obtained relief through either a judicial order or a voluntary change in position by the agency); *Sliney v. Fed. Bureau of Prisons*, 626 F. Supp. 2d 43, 47 (D.D.C. 2009) (noting that the court "will not assess fees when the agency has demonstrated that it had a lawful right to withhold disclosure") (quoting *Davy*, 550 F.3d at 1159).

pursuant to such Executive Order." *Id.* § 552(b)(1); *see also Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007).

In the instant case, there is no dispute that the Agreement was, in fact, classified pursuant to Executive Order 13,292. *See* Bliss Decl. ¶¶ 7-9; *see generally* Pl.'s Mot.; Pl.'s Reply; Pl.'s Opp'n to Def.'s Mot. for Summ. J.  The sole issue before the court, therefore, is whether the Agreement was properly classified pursuant to the criteria set forth in that Executive Order.

Executive Order 13,292 authorizes a government agency to classify information if: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or under the control of the United States Government; (3) the information falls within one or more of the categories of information listed in §1.4 of the order; and (4) the original classification authority determines that the unauthorized disclosure of the information could be expected to result in damage to the national security, and the original classification authority is able to identify or describe the damage.  Exec. Order. No. 13,292 § 1.1(a)(1)-(4).  The court turns to an examination of these factors.

### 1.  The Agreement Was Classified by an Original Classification Authority

The Agreement was classified by Julia Christine Bliss, the Assistant United States Trade Representative for Services and Investment.  Def.'s Opp'n at 8.  Bliss was the lead U.S. negotiator in the WTO services negotiations and was responsible for overseeing all multilateral and bilateral services and investment negotiations on behalf of the defendant. Bliss Decl. ¶¶ 1-3.  By virtue of this position, Bliss had original classification authority at the "secret" level.  *Id.* ¶ 3.  Bliss classified the Agreement as "foreign government

information" based on her determination that the Agreement was "under the control of the United States government" and "concern[ed] . . . foreign government information," which is protected under paragraph 1.4(b) of Executive Order 13,292. *Id.* ¶¶ 3, 8(a); *see also* Exec. Order 13,292 § 1.4(b). It is clear, therefore, that the Agreement was classified by an individual possessing original classification authority.

### 2. The Agreement Was Produced by and for the United States

It is equally clear that the Agreement was produced by and for the United States. Executive Order 13,292 requires that the subject document be owned by, produced by or for, or under the control of the United States Government. Exec. Order 13,292 § 1(a)(2). Here, the Agreement was negotiated by and under the control of the defendant, an office within the U.S. government. Bliss Decl. ¶ 8(a). Therefore, the Agreement was produced by and for, and under the control of, the United States.

### 3. The Information in the Agreement Falls Within At Least One of the Categories of Information Listed in § 1.4 of Executive Order 13,292

The third criterion listed in Executive Order 13,292 requires that the material in question fall within at least one of the categories of information listed in § 1.4 of the Order. Exec. Order. 13,292 § 1.1(a)(3). Section 1.4 authorizes the classification of, *inter alia*, "foreign government information" as well as information concerning "foreign relations or foreign activities of the United States." *Id.* § 1.4(b), (d). Foreign government information is defined as "information produced by the United States Government pursuant to or as a result of a joint arrangement with a foreign government or governments, or an international organization of governments, or any element thereof, requiring that the information, the arrangement, or both, are to be held in confidence." *Id.* § 6.1(r)(2).

The WTO rules governing the disclosure of modifications to commitments, compensation negotiations and agreements under Article XXI of the GATS, like the Agreement at issue, provide that all such materials must remain classified until their ultimate declassification at the conclusion of the negotiating process.  Specifically, WTO document WT/L/452, titled *Procedures for the Circulation and Derestriction of WTO Documents*, provides that although WTO documents generally are not restricted, "documents relating to modification or renegotiation of concessions or to specific commitments pursuant to Article XXVIII of the GATT 1994 or Article XXI of the GATS respectively *shall be restricted* and automatically derestricted upon certification of such changes in the schedules."  WT/L/452 ¶ 2(d) (emphasis added).  Similarly, WTO document S/L/80, titled *Procedures for the Implementation of Article XXI of the General Agreement on Trade in Services (GATS) (Modification of Schedules)*, provides that

> [u]pon completion of each negotiation conducted under paragraph 2(a)[3] of Article XXI, the modifying Member shall send to the Secretariat a joint letter signed by the Members concerned, together with a report concerning the results of the negotiations which shall be initialed by the Members concerned.  The Secretariat will distribute the letter and the report to all Members in a *secret* document.

S/L/80 ¶¶ 5-6 (emphasis added).  These documents provide ample support for the defendant's assertion that the WTO rules prohibited the unilateral disclosure of the Agreement while negotiations were ongoing.

Although the plaintiff argues that these provisions expressed nothing more than the WTO's own policies for how and when the *WTO*, and specifically the WTO Secretariat, may publicly disclose such documents, Pl.'s Mot. at 27, no such limitation

---

3       Section 2(a) of Article XXI of the GATS states that members whose benefits are affected by modifications to commitments made under the GATS shall enter into negotiations with the breaching party with a view toward reaching agreement on any necessary compensatory adjustment.

appears in the text of WT/L/452, which provides only that such documents "shall be restricted." *See* WT/L/452 ¶ 2(d). Likewise, the rule requiring the WTO Secretariat to distribute reports concerning Article XXI negotiations in a "secret" document would make little sense if member states were free to unilaterally disclose information regarding these negotiations. *See* S/L/80 ¶¶ 5-6. Indeed, the plaintiff has not identified a single instance in which a WTO member state unilaterally disclosed documents falling within the ambit of these provisions. *See generally* Pl.'s Mot.; Pl.'s Reply.

The plaintiff notes that the EU informed the defendant that it would need to release the Agreement when EU members moved to adopt it, and argues that this fact demonstrates that the EU did not understand the WTO rules to prohibit unilateral disclosure. Pl.'s Mot. at 26; Pl.'s Reply at 9-11. Yet the fact that the EU approached the defendant prior to disclosing the Agreement seems to provide equal support to the defendant's position that WT/L/452 and S/L/80 prohibited disclosure of the Agreement without the consent of the counterparty to the Agreement. Pl.'s Mot. at 26. Indeed, the EU never sought to release the Agreement unilaterally. Def.'s Opp'n at 9.

For these reasons, the court concludes that the Agreement constituted "foreign government information" for purposes of § 1.4 of Executive Order 13,292.

**4. The Original Classification Authority Determined that the Unauthorized Disclosure of the Information Reasonably Could Be Expected to Result in Harm to National Security and Adequately Described that Harm**

Turning to the fourth criterion listed in Executive Order 13,292, Bliss explains the impact of imprudent disclosure of the Agreement on United States national security as follows:

Unilateral public release by the United States of information contained in a WTO 'secret' document would damage the trust that other WTO

> members have in the United States to protect trade negotiating documents
> that are exchanged with the expectation that they will be kept confidential
> . . . [which will] undermine the ability of the United States to negotiate
> and conclude trade and investment agreements on terms favorable to
> United States economic and security interests . . . .   Such a disclosure
> would undermine trust by other WTO members in the willingness or
> ability of the United States to keep negotiating documents confidential.

Bliss Decl. ¶¶ 11-12.  Similarly, David Apol, Chief Counsel for Administrative Law of

the USTR, states that senior USTR officials initially discouraged early derestriction of

the Agreement because of  "concern that seeking the EU's cooperation at that time might

complicate or distract from other negotiations that were then underway."  Apol Decl. ¶ 5.

These concerns substantiate the defendant's assertion that it was "reasonable for [the

defendant] to conclude that breaking the agreement [it] had with 152 other countries

might adversely affect its ability to negotiate constructively with those countries in the

future."  Def.'s Opp'n at 11.

This court has previously upheld the nondisclosure of documents pertaining to

multinational trade negotiations which are "sensitive and controversial" if disclosure of

the documents would not only expose the government's legal, policy and strategic

analysis, but would also permit other governments to gauge the strength of U.S.

negotiating positions.  *See Ctr. for Int'l Envtl. Law v. U.S. Trade Rep.*, 237 F. Supp. 2d

17, 32 (D.D.C. 2002).  In that case, nondisclosure was justified because "public release of

[the] documents would reveal high level internal government deliberations on foreign

investment issues and thus undermine the U.S. government's ability to debate and resolve

some of the most complex and sensitive issues at stake in the negotiations."  *Id*.  The

court noted that "disclosure of these documents would make it considerably more

difficult for U.S. negotiators to conclude . . . free trade agreements with other governments that fully secure U.S. economic interests." *Id.*

Furthermore, the Circuit has consistently upheld agency decisions to deny public access to documents in cases in which their release would result in a breach of confidentiality. *See Krikorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir 1993) (holding that documents provided to the United States from a foreign government fell within FOIA Exemption 1 because the release of the documents would "jeopardize 'reciprocal confidentiality' and damage national security"); *Baez v. Dep't of Justice*, 647 F.2d 1328, 1335 (D.C. Cir. 1990).

As in the aforementioned cases, the unilateral disclosure of the Agreement prior to the conclusion of the negotiations could have revealed sensitive negotiating positions, disrupted ongoing negotiations and undermined the confidence of other nations in U.S. government assurances of confidentiality. *See* Bliss Decl. ¶¶ 11-12.  Accordingly, the court concludes that the classifying authority has sufficiently identified and articulated the harm that could have resulted from the unauthorized disclosure of the Agreement.

The court therefore holds that the plaintiff failed to demonstrate his entitlement to an award of attorney's fees because the defendant's decision to withhold the Agreement was correct as a matter of law pursuant to the first exemption to the FOIA.  As a result, the court denies the plaintiff's request for an award of attorney's fees.


## IV.  CONCLUSION

For the foregoing reasons, the court denies the plaintiff's motion for a determination of eligibility of attorney's fees and costs.  An Order consistent with this

Memorandum Opinion is separately and contemporaneously issued this 28th day of

September, 2009.

RICARDO M. URBINA<br>
United States District Judge